2011 VT 124

## In re R.W. and N.W., Juveniles

[39 A.3d 682]

No. 11-006

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 18, 2011

Motion for Reargument Denied December 19, 2011

*Michael Rose*, St. Albans, for Appellant B.W.

*William Sorrell*, Attorney General, Montpelier, and *Martha E. Csala*, Assistant Attorney General, and *Andrew Stone*, Legal Intern (On the Brief), Waterbury, for Appellant/Cross-Appellee Department for Children & Families.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Respondents-Appellees.

¶ 1. **Burgess, J.** In this termination of parental rights case, we consider two separate appeals pertaining to mother's and father's respective rights to their two daughters, seventeen-year-old R.W. and thirteen-year-old N.W. The case presents novel jurisdictional questions because the parents and children are citizens of Sri Lanka and, although mother and the children have been residents of Vermont for a number of years, father continues to reside in Sri Lanka and has never been to Vermont. The Department for Children and Families (DCF) petitioned to terminate both mother's and father's residual parental rights. The family division granted the request as to mother, but concluded it lacked personal jurisdiction over father. Mother appeals termination of her parental rights, arguing that the family division of the superior court applied the incorrect standard of proof with respect to changed circumstances and engaged in a faulty best-interests analysis. DCF filed a separate appeal as to father, arguing that even though father lacks minimum contacts with Vermont, the court has jurisdiction to adjudicate the status of his children, who were within the court's jurisdiction. We reverse the court's decision as to both parents and remand the cases.

¶ 2. The court found the following facts. Mother was born in Sri Lanka to a Catholic Sinhalese family. Mother worked as a teacher in Sri Lanka. She married father in 1992. R.W. and N.W. were born in Sri Lanka in February 1994 and November 1997, respectively. In 2000, after father lost money in business dealings, mother left for New York City and found work as a nanny to help pay off father's debts. R.W. came to live with mother in 2002 when she was eight. Mother integrated herself into the Sinhalese community in New York and met a man, whom she married in July 2003.[1]

¶ 3. Mother, her new husband, and R.W. moved to Rutland, Vermont in the summer of 2003. Shortly thereafter, N.W. came to live with them. The family then moved to Barre in September 2003 to act as caretakers for a motel. The girls attended school, learned English, and became exposed to American culture. In July 2005, the family moved again, this time to Stowe to work at an inn. Some time between April and June 2006, R.W. disclosed to

---

[1] Even though there is no indication that mother and father terminated their Sri Lankan marriage and therefore the legal validity of mother's second marriage is questionable, this man is referred to as mother's husband or the girls' stepfather throughout this decision.

her school guidance counselor that her stepfather was sexually and physically abusing her. She also alleged that mother was disciplining her by hitting her with a broom handle. R.W. described a specific incident where mother hit her with a wooden spoon on her hand. DCF investigated and substantiated the allegations of abuse. Following DCF's petition to have the girls adjudicated children in need of care or supervision (CHINS), the court granted an emergency detention order on June 9, 2006, and DCF obtained custody of the girls. R.W. and N.W. were placed in a foster home, and R.W. began to attend counseling. Both girls adjusted quickly to their new situation and excelled academically and socially in their new schools.

¶ 4. Unfortunately, the merits hearing on the CHINS petitions was delayed due to the difficulty of obtaining a Sinhalese interpreter to assist mother, her counsel, and the court. During this waiting period, mother and stepfather had a baby boy in August 2006. Visits with mother were difficult during this interim period because stepfather was prohibited from having contact with the girls by the family division and also by the criminal division in connection with pending criminal charges. The merits hearing was finally held in January 2007. At the hearing, mother admitted that she had hit R.W. with a wooden spoon. She claimed that such punishment was acceptable in Sri Lankan culture. The court found that DCF had established by a preponderance of the evidence that mother had physically abused R.W., and that N.W. was at risk of abuse. The court declined to make findings on the sexual abuse allegations.

¶ 5. The initial case plan had a goal of reunification. Nonetheless, the girls remained in DCF custody through 2007. Reunification and visitation with mother were complicated by the fact that mother was still living with stepfather. Mother was economically dependent on stepfather to support and care for her and the new baby. She was also legally dependent on him for her status in the United States. Visitation was supervised and took place primarily at DCF offices. Although mother admitted that even prior to R.W.'s allegations she recognized that stepfather had a strong affinity for R.W. and she suspected he was "engaging in inappropriate sexual behavior" with her, she blamed R.W. for the break up of the family and was skeptical of the sexual abuse claims. According to R.W., during visits, mother repeatedly urged R.W. to tell the truth and drop the allegations, but the visit monitors were

unable to tell how much pressure mother applied to R.W. because the conversations were in Sinhalese.

¶ 6. In 2008, mother began to believe R.W.'s allegations, and stepfather left the household. DCF assisted mother in obtaining an apartment and filing a petition for asylum so she could obtain residency visas for her and the girls. After progressively increased visitation, in the fall of 2008, R.W. and N.W. were living almost full-time with mother while still in DCF custody. Mother's relationship with the girls was strained by disagreements over the girls' clothing and behavior. Mother perceived that they lacked respect for their elders, used inappropriate speech, and wore immodest clothing.

¶ 7. In February 2009, mother and R.W. had an argument about household chores, and mother broke a household item in anger and frustration. In March 2009, an event occurred in which it appeared that mother was not adequately supervising R.W. DCF considered it a serious incident and again placed the girls in foster care. Mother lost the financial support DCF was providing and in June 2009 moved first to New York to stay with friends and then to Texas, where stepfather was living. While in Texas, mother lived with him for at least some period of time. Mother had a supervised visit with the girls in August 2009, but then had little contact with them until her return to Vermont in February 2010. At the time of the final hearing, mother and her son were living with a friend in Vermont. Mother was working part-time, taking English classes, and trying to obtain a residence. She also had instituted proceedings to end her marriage with stepfather.

¶ 8. In September 2009, DCF filed petitions to terminate the parental rights of father and mother. In March 2010, DCF moved for permission to serve father by publication. In support, a DCF investigator averred that he had been unable to locate father by searching computer websites, or by contacting the Sri Lankan embassy and a Sri Lankan government agency where it was believed father had been employed. The investigator also explained that he had attempted to contact a friend of mother for assistance in locating father, but this person had not called back. There is no mention in the affidavit as to whether the investigator sought mother's assistance directly. Based on DCF's application and supporting affidavit, the court granted service by publication, and notices of the termination hearing were published in a Sri Lankan newspaper in English and Sinhalese.

¶ 9. Evidently, mother did have contact information for father. At the final hearing, mother testified that R.W. asked mother for father's electronic mail address. Apparently, R.W. used the electronic mail address to contact father, who then contacted DCF's counsel and the girls' caseworker. Father's emails to DCF's counsel indicate that father sought to obtain a visa so he could attend the termination hearing, but that he had been unable to do so.

¶ 10. Prior to the commencement of the final hearing, a person identifying himself as father contacted the court, and there was a discussion on the record as to whether father could participate by phone. The court concluded that it could not make the necessary findings under Rule for Family Proceedings 17 to allow father's participation by phone because it could not verify father's identity or assure the adequacy of its telephone system to afford all parties participation as required by the rule.[2] Thus, the court denied the request.

¶ 11. The termination hearing proceeded against mother. DCF presented testimony from the girls' therapist, their foster parents, and two DCF caseworkers. Mother testified on her own behalf. Based on the evidence, the court concluded that there was a change in circumstances because over a substantial period of time mother had not made progress towards addressing the issues that led to the children being taken into custody. The court made no findings regarding the truth of the sexual abuse allegations against stepfather, but it found that mother did not properly support R.W., inappropriately pressured R.W. to recant her claims of abuse, and did not demonstrate interest and affection for the girls. The court determined that the State's burden was to show stagnation by a preponderance of the evidence, and it found that DCF had met this burden. The court found by clear and convincing evidence that termination was in the children's best interests because mother would not be able to parent them within a reasonable time and they needed stability.

---

[2] Rule 17 states that the court may permit a party "to testify or participate in a hearing by telephone" provided certain "[n]ecessary [c]onditions" are satisfied. V.R.F.P. 17(a)(2), (b). Among other things, these conditions include that there is assurance to the satisfaction of the court of the caller's identity, and that the telephone connections and equipment can adequately enable all parties to hear and speak. V.R.F.P. 17(b)(1), (3).

¶ 12. On those bases, the court terminated mother's parental rights. Following judgment, DCF moved to amend the order to also include termination of father's parental rights. The court denied the request. Mother appeals termination of her parental rights, and DCF appeals the court's denial of its request to assume jurisdiction over father and to terminate his parental rights.

I.

¶ 13. We first address mother's appeal. Mother argues that the court erred by employing a preponderance-of-the-evidence, rather than a clear-and-convincing-evidence, standard to evaluate whether she had stagnated in her ability to care for the children. Mother further contends that the court's best-interests analysis lacked a rational basis.

¶ 14. When termination of parental rights is sought, the trial court must determine, first, whether there has been a substantial change in material circumstances and, second, whether termination is in the child's best interests. *In re B.W.*, 162 Vt. 287, 291, 648 A.2d 652, 654 (1994); see 33 V.S.A. §§ 5113, 5114. A substantial change in material circumstances is "most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." *In re B.W.*, 162 Vt. at 291, 648 A.2d at 654-55 (quotation omitted). "Stagnation may be shown by the passage of time with no improvement in parental capacity to care properly for the child." *Id.* (quotation omitted).

¶ 15. The State has the burden of proof at both stages and, as to each point, must meet its burden "by clear and convincing evidence." *In re J.R.*, 164 Vt. 267, 270, 668 A.2d 670, 673 (1995). Thus, the trial court must find stagnation, as well as best interests, by clear and convincing evidence. On appeal, we will affirm the trial court's findings unless they are clearly erroneous and its conclusions if supported by the findings. *In re B.S.*, 166 Vt. 345, 350, 693 A.2d 716, 719 (1997).

¶ 16. Mother argues that the court's finding of stagnation was incorrectly based on a preponderance-of-the-evidence standard. On this point there is no dispute. Although the court recognized that the determination of the children's best interests is by clear and convincing evidence, the court stated, incorrectly, that change of circumstances may be proven "simply by a

preponderance of the evidence." It was error to do so. The court's determination of whether there has been a material change in circumstances must be by clear and convincing evidence. *In re A.W.*, 164 Vt. 412, 416, 670 A.2d 1265, 1267 (1995); see *In re T.E.*, 155 Vt. 172, 175, 582 A.2d 160, 162 (1990) (explaining that "due process requires that a higher standard — clear and convincing evidence — be imposed on the State whenever it seeks permanently to sever" parental rights).

¶ 17. Conceding that the court used the incorrect standard, the State argues that the error was harmless. We have employed the harmless error standard in termination cases, and, under that standard, an error warrants reversal only if "a substantial right of the party is affected." *In re B.S.*, 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995) (citing V.R.C.P. 61 and V.R.F.P. 2(a)). In this case, the State submits that the error does not warrant reversal because it is evident that the court's conclusion regarding mother's stagnation would have been the same under a clear-and-convincing-evidence standard.

¶ 18. The error cannot be considered harmless. The court's error related to the central issue of whether there were changed circumstances by stagnation, and the court specifically noted that it was making findings only by a preponderance of the evidence. The court recognized that part of the four-year delay in this case was "attributable to the court's own scheduling difficulties," and that DCF could have done more to assist mother, but it concluded that "it is more likely than not" that mother would have failed to progress even without these delays. Given the close balancing that the court engaged in and its explicit determination of the issue by an impermissibly low standard of proof, we cannot conclude that as a matter of law that the court's conclusion would have been the same under a clear-and-convincing-evidence standard. In addition, we decline to weigh the evidence in the first instance. Therefore, the matter is remanded for a finding of whether there was a substantial change of material circumstances in this case. See *In re J.R.*, 164 Vt. at 271, 668 A.2d at 673-74 (reversing where findings were made under an incorrectly low standard of proof). On remand, the trial court may either decide the matter on the current record or hold a new hearing if presented with a persuasive proffer of new, more recent evidence material to the question of whether there was a substantial change of circum-

stances. See *In re D.P.*, 147 Vt. 26, 32, 510 A.2d 961, 971 (1986) (allowing a new hearing on remand "[b]ecause of the passage of time since the original disposition hearing").

¶ 19. Because it may arise again on remand, we briefly address mother's second argument that the court's best-interests analysis relying on the children's need for permanency lacks a rational basis. As to R.W., mother argues that R.W.'s best interests will not be served by terminating her rights because R.W. will soon reach the age of majority and will not have any ability to be adopted in the interim due to the uncertainty regarding father's parental rights. Essentially, mother contends that there is no need to terminate mother's rights because regardless of the status of mother's residual rights, R.W. will not be freed for adoption. In addition, mother argues that the court terminated mother's rights to N.W. in part to maintain the same resolution for each child because the court found that separate resolutions for the girls would be "psychologically traumatic" for N.W. Because mother perceives that termination of her rights to R.W. was error, she argues that there is no rational basis to terminate her rights to N.W. either.

¶ 20. The court's analysis was not lacking in reason. Although R.W. and N.W. will not be immediately freed for adoption because of the ongoing proceedings regarding father, this does not preclude termination of mother's rights. The children's therapist testified and the court found that both girls need certainty and stability. Even if they are not totally free for adoption, severing the parental bond with mother could help move them towards this needed permanency.[3]

## II.

¶ 21. Next, we consider DCF's appeal from the court's refusal to adjudicate termination of father's rights. As previously noted, the termination petition relating to father was initially left open following the trial court's denial, at the commencement of the final hearing, of father's request to participate by telephone. Thus, the court's final order dealt only with the case related to mother and

---

[3] R.W. will soon reach the age of majority. The question of whether the termination petition will become moot once she does is not before us. We do note, however, that the jurisdiction of the family division will end when R.W. turns eighteen. 33 V.S.A. § 5103(c).

noted that "no decision was made with respect to [father], and indeed the court did not even address the jurisdictional and other more substantive issues regarding [father] and his involvement, if any, in these proceedings." The State then moved to amend the final order to terminate father's parental rights, asserting that the court had personal jurisdiction over father pursuant to the so-called status exception — not yet recognized by this Court — to the minimum contacts ordinarily necessary for state court jurisdiction consistent with due process. The court denied the motion in a one-page order, citing its reluctance to proceed when neither father nor anyone else was in a position to appeal, and so declined to resolve "this important policy question . . . [as] a single trial judge by default." While not specifically denoted as such, we read the court's order as a denial of the termination petition for lack of personal jurisdiction over father.

¶ 22. DCF appealed this order. Using the electronic mail and street address that father provided to DCF counsel, DCF sent father a copy of the notice of appeal in this case and DCF's brief. This Court also attempted to contact father using the electronic mail address in the trial court record. Father has not responded to DCF or this Court, and has not entered a notice of appearance in this case.

■ ¶ 23. DCF argues that even though father is a citizen and resident of Sri Lanka and has never been to Vermont, the family division had jurisdiction to adjudicate the status of his parental rights to R.W. and N.W., who were undeniably within the court's jurisdiction. To understand DCF's argument, we begin with a review of the requirements for personal jurisdiction. Vermont courts may exercise jurisdiction over an out-of-state individual where there is both statutory and constitutional power to do so. Vermont's long-arm statute provides:

> Upon the service, and if it appears that the contact with the state by the party or the activity in the state by the party or the contact or activity imputable to him is sufficient to support a personal judgment against him, the same proceedings may be had for a personal judgment against him as if the process or pleading had been served on him in the state.

12 V.S.A. § 913(b). We have held that the statute's terms are broad enough to permit a court to exercise jurisdiction over an absent

defendant "to the full extent permitted by the Due Process Clause." *N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 40, 572 A.2d 1382, 1385 (1990). Due process allows a forum to assert jurisdiction over a nonresident defendant who has " 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Id.* at 41, 572 A.2d at 1386 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

¶ 24. DCF agrees that father does not have the minimum contacts needed for conventional Vermont jurisdiction. Nevertheless, DCF argues that in termination-of-parental-rights cases the court's jurisdiction should be grounded in the forum's connection to the children, rather than to the parents. According to DCF, it is the children's contacts that provide a sufficient basis for the court to determine the legal status of the parents' relationship to the juveniles within the court's jurisdiction.

¶ 25. The Supreme Court of the United States has long recognized a status basis for exercising jurisdiction in satisfaction of due process requirements. The seminal case of *Pennoyer v. Neff*, which required a defendant's actual presence or service in a state for jurisdiction to attach, excepted from its strict rule "cases affecting the personal *status* of the plaintiff." 95 U.S. 714, 733 (1877). The Court explained:

> To prevent any misapplication of the views expressed in this opinion, it is proper to observe that we do not mean to assert, by any thing we have said, that a State may not authorize proceedings to determine the *status* of one of its citizens towards a non-resident, which would be binding within the State, though made without service of process or personal notice to the non-resident. The jurisdiction which every State possesses to determine the civil *status* and capacities of all its inhabitants involves authority to prescribe the conditions on which proceedings affecting them may be commenced and carried on within its territory. The State, for example, has absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved.

*Id.* at 734-35. Subsequently, the Supreme Court's jurisprudence established the minimum contacts test as the basis for jurisdiction

for both in personam, *Int'l Shoe*, 326 U.S. at 316, and eventually in rem cases, but continued to exempt "status cases," recognizing *Pennoyer*'s extension of jurisdiction to "cases involving the personal status of the plaintiff, such as divorce actions, could be adjudicated in the plaintiff's home State even though the defendant could not be served within that State." *Shaffer v. Heitner*, 433 U.S. 186, 201 (1977) (citing *Pennoyer*, 95 U.S. at 733-35). In *Shaffer*, the Court specifically noted: "We do not suggest that jurisdictional doctrines other than those discussed in text, such as the particularized rules governing adjudications of status, are inconsistent with the standard of fairness." *Id.* at 208 n.30.

¶ 26. The critical question in this appeal is whether a child's relationship to her parents is such an adjudication of status. The Supreme Court has not defined status jurisdiction or explicitly recognized its application to any type of case other than divorce. The issue of status jurisdiction for custody matters did arise in the case of *May v. Anderson*, 345 U.S. 528 (1953). In *May*, the father obtained a custody decree from Wisconsin, where he and the children were domiciled, while the mother and children were in Ohio and without the mother's in-state notice or participation. Writing the majority decision for a divided court, Justice Burton framed the issue as whether "an Ohio court must give full faith and credit to a Wisconsin decree awarding custody of the children to their father when that decree is obtained by the father in an *ex parte* divorce action in a Wisconsin court which had no personal jurisdiction over the mother." *Id.* at 528-29. Justice Burton reasoned that Ohio was not required to recognize the Wisconsin decree, explaining that the mother's rights to "the care, custody, management and companionship of her minor children" were "far more precious" than property rights and, thus, could not be adjudicated without personal jurisdiction over her. *Id.* at 533. While this decision appears to reject status-based jurisdiction for custody cases, in a concurrence necessary for the majority, Justice Frankfurter narrowed the holding. He emphasized that "the only thing the Court decides . . . is that the Full Faith and Credit Clause does not require Ohio, in disposing of the custody of children in Ohio, to accept, in the circumstances before us, the disposition made by Wisconsin." *Id.* at 535 (Frankfurter, J., concurring).

¶ 27. In dissent, Justice Jackson was concerned with the Court's apparent holding that a "state in which a child and one parent are

domiciled and which is primarily concerned about his welfare cannot constitutionally adjudicate controversies as to his guardianship." *Id.* at 539 (Jackson, J., dissenting). Noting the "difference between a proceeding involving the status, custody and support of children and one involving adjudication of property rights," he explained that jurisdiction for custody disputes should be determined "with the idea of making the best disposition possible for the welfare of the children." *Id.* at 541. Therefore, he explained:

> Personal jurisdiction of all parties to be affected by a proceeding is highly desirable, to make certain that they have had valid notice and opportunity to be heard. But the assumption that it overrides all other considerations and in its absence a state is constitutionally impotent to resolve questions of custody flies in the face of our own cases.

*Id.*

¶ 28. Given the fragmented nature of the Court's reasoning, the holding of *May* has been viewed as limited to the reasoning of Frankfurter's concurrence and not as a bar to exercising status jurisdiction in custody cases. See *In re Marriage of Leonard,* 175 Cal. Rptr. 903, 907-08 (Ct. App. 1981) (construing *May* as limited to whether state is required to recognize custody order under Full Faith and Credit Clause); R. Wasserman, *Parents, Partners, and Personal Jurisdiction,* 1995 U. Ill. L. Rev. 813, 874-79 (explaining that Frankfurter's view of what the Court decided in *May* is "widely accepted," but arguing that Burton's opinion is incompatible with Frankfurter's view and is good law). In any event, *May* concerned custody and does not control the question of whether a court may exercise status-based jurisdiction over a termination proceeding absent personal jurisdiction over both parents. See *In re Termination of Parental Rights to Thomas J.R.,* 2003 WI 61, ¶¶ 32-35, 663 N.W.2d 734 (discussing *May* and concluding that it is not dispositive for cases involving termination of parental rights).

¶ 29. Some clues indicate that the Court would be receptive to applying status jurisdiction to termination cases. First, in *Shaffer's* discussion of status jurisdiction, the Court cited to a law review article by Justice Traynor. 433 U.S. at 208 n.30 (citing R. Traynor, *Is This Conflict Really Necessary?,* 37 Tex. L. Rev. 657 (1959)). In

that article, Justice Traynor argues that in addition to marriage a state should have jurisdiction to adjudicate the status of children within the state even if the parents lack minimum contacts with the state. As he explains,

> the state where a child is present must be competent to regulate his custody whether his parent is present or not, and if the parent cannot be found or has failed to discharge his parental obligations, that state, given the best notice reasonably possible, should be free to promote the interest of the child by permitting his adoption.

Traynor, *supra*, at 662 (footnote omitted). In addition, following *Shaffer* in *Stanley v. Illinois*, the Court held that due process requires that an unwed father be granted a hearing on his parental fitness before his child could be taken from him in a dependency proceeding, but noted that the neglect proceedings could go forward if the father did not respond to notice, even notice made by publication. 405 U.S. 645, 657 n.9 (1972).

¶ 30. In Vermont, this Court has applied status jurisdiction in the context of divorce actions, emphasizing that the " 'state, by virtue of its command over its domiciliaries and its large interest in the institution of marriage, can alter within its own borders the marriage status of the spouse domiciled there, even though the other spouse is absent.' " *Poston v. Poston*, 160 Vt. 1, 5, 624 A.2d 853, 855 (1993) (quoting *Williams v. North Carolina*, 317 U.S. 287, 298-99 (1942)). Although we have not directly applied this principle to other situations, such as custody, we have recognized "the general rule in other states that jurisdiction of a proceeding involving the commitment or control of a delinquent or neglected child is dependent on the presence of the child within the jurisdiction, regardless of his place of residence or that of his parents." *In re B.J.C.*, 149 Vt. 196, 198, 540 A.2d 1047, 1049 (1988) (affirming court's exercise of jurisdiction over emergency detention hearing for nonresident child who was brought into state under exigent circumstances and whose parents were out of state).

¶ 31. Based on the foregoing, we conclude that status jurisdiction applies to cases involving termination of parental

rights.[4] As another court explained, status is "a relationship between two persons, which is not temporary in its nature, is not terminable at the mere will of either and with which the State is concerned. Marriage is a status and so too is the relationship of parent and child, whether natural or adoptive." *In re Marriage of Leonard*, 175 Cal. Rptr. at 908 (quotation and alterations omitted). We agree. Much like the marriage relationship, severance of a parent's legal relationship to his or her child requires state intervention and is a matter of state concern. Thus, a child's home state has jurisdiction to adjudicate the status of a child present there even if the parents lack minimum contacts with the forum.

¶ 32. In so ruling, we join the other jurisdictions that have similarly held that asserting jurisdiction over termination proceedings based on status does not offend the Due Process Clause. See *J.D. v. Tuscaloosa Cnty. Dep't of Human Res.*, 923 So. 2d 303, 310 (Ala. Civ. App. 2005) (holding that "status exception to the requirement that the defendant have minimum contacts with the forum state applies to termination-of-parental-rights proceedings"); *S.B. v. State*, 61 P.3d 6, 14-15 (Alaska 2002) (holding that parent's due process rights are not violated by exercise of status jurisdiction over termination proceeding); *In re M.L.K.*, 768 P.2d 316, 319 (Kan. Ct. App. 1989) (holding that status jurisdiction applies to termination proceeding); *Div. of Youth & Family Servs. v. M.Y.J.P.*, 823 A.2d 817, 836 (N.J. Super. Ct. App. Div. 2003) (concluding that New Jersey had jurisdiction to terminate parental rights of mother living in Haiti to child brought to state by father); *In re Adoption of Copeland*, 43 S.W.3d 483, 487 (Tenn. Ct. App. 2000) (holding that termination proceeding involves an adjudication of status and does not require minimum contacts over parents); *State ex rel. W.A.*, 2002 UT 127, ¶¶ 22-28, 63 P.3d 607 (holding that status jurisdiction applies to termination cases); *In re Thomas J.R.*, 2003 WI 61, ¶¶ 37-38 (holding that status jurisdiction applies in all custody cases including termination); see generally B. Atwood, *Child Custody Jurisdiction and Territoriality*, 52 Ohio St. L.J. 369, 372-73 (1991) (arguing for a status-based approach to custody jurisdiction and explaining that "a court needs 'territorial jurisdiction' over the child custody dispute, rather than personal jurisdiction over the absent contestant"

---

[4] We need not, and do not, decide whether status jurisdiction also applies to custody cases.

because "the needed judicial power arises from child-centered contacts with the forum state").

¶ 33. Decisions holding otherwise are not persuasive because of the unique facts or considerations involved in those cases. In *In re Vernon R.V.,* while the court concluded that it could not terminate a noncitizen, nonresident parent's rights based on the mother's petition, it left open the possibility of exerting status jurisdiction in an adoption-contemplation termination case because the interest of the state and of the child would be much greater. 1999-NMCA-125, ¶ 15, 991 P.2d 986. Similarly, in *In re John Doe,* the Hawaii Supreme Court declined to exercise status jurisdiction over a proceeding to terminate the rights of a foreign national parent who was not present in the state where neither parent was a resident of the state and the child became a resident there only as a result of the proceedings. 926 P.2d 1290, 1298-1300 (Haw. 1996). In contrast, here, the state's interest is much stronger because mother and both girls resided in Vermont for years prior to the petition for termination.

¶ 34. Concluding that a termination proceeding is a status-based adjudication generally, we must determine whether the exercise of status jurisdiction in this particular case is appropriate. This is a question of both statutory and constitutional authority because to exercise jurisdiction, a state must have both. *N. Aircraft, Inc.,* 154 Vt. at 40, 572 A.2d at 1385; see *State ex rel. W.A.,* 2002 UT 127, ¶ 14 (explaining that to determine jurisdiction, court must assess whether a statute confers authority and whether assertion of jurisdiction comports with due process). We consider these questions of law de novo. *In re Beckstrom,* 2004 VT 32, ¶ 9, 176 Vt. 622, 852 A.2d 561 (mem.).

¶ 35. Here, the source of statutory authority is not Vermont's general long-arm statute, which does not address jurisdiction based on status, but the Uniform Child Custody Jurisdiction Act (UCCJA), which contains specific provisions for determining which forum has jurisdiction to adjudicate matters related to child custody. See 15 V.S.A. §§ 1031-1051.[5] The UCCJA

---

[5] This past session the Legislature repealed the UCCJA and enacted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). 2011, No. 29. Under the UCCJEA, a child custody proceeding is specifically defined to include a proceeding to terminate parental rights. *Id.* § 1, enacted at 15 V.S.A. § 1061(4). The UCCJEA is also more specific concerning its application to parties outside

was "created to end the interstate custody jurisdictional tug-of-war between states." K. Stoner, *The Uniform Child Custody Jurisdiction & Enforcement Act (UCCJEA) — A Metamorphosis of the Uniform Child Custody Jurisdiction Act (UCCJA)*, 75 N.D. L. Rev. 301, 301 (1999); see Wasserman, *supra*, at 865 (explaining that the UCCJA was designed to prevent forum shopping and conflict arising from multiple states simultaneously adjudicating custody of same child). The statute bases jurisdiction on the child's relationship with the forum, not the parents' presence in, or contacts with, that forum. Thus, under the UCCJA, a state has jurisdiction to determine a child custody matter if it "is the home state of the child at the time of commencement of the proceeding."[6] 15 V.S.A. § 1032(a)(1)(A); see also Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A(a), (c)(2)(A) (requiring states to recognize and enforce custody determinations made by a jurisdiction that was child's home state).

¶ 36. The UCCJA defines "custody proceeding" as including "proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings." 15 V.S.A. § 1031(3). Termination is not specifically included in this list, but it is settled that a TPR proceeding from a CHINS adjudication is a child neglect and dependency proceeding within the terms of the UCCJA. *In re B.C.*, 169 Vt. 1, 4, 726 A.2d 45, 48 (1999) (recognizing that "CHINS and TPR proceedings are subject to the Uniform Child Custody Jurisdiction Act (UCCJA)"). Other courts similarly apply the UCCJA to termination cases. See, e.g., *In re Copeland*, 43 S.W.3d at 487 (holding that termination is a custody proceeding within the meaning of the UCCJA because it "determines whether a parent will retain custodial rights of his or her child"); *In re Thomas J.R.*, 2003 WI 61, ¶ 26 (concluding that termination of parental rights is a custody proceeding within the

---

Vermont. It explains that "[a] child custody determination made by a Vermont court that had jurisdiction under this chapter binds all persons who have been served in accordance with the Vermont laws or notified in accordance with section 1066 of this title or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard." 15 V.S.A. § 1064. The Act specifies that "[p]hysical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination." *Id.* § 1071(c).

[6] The statute provides other possible bases for jurisdiction not relevant to the facts of this case.

meaning of the UCCJA). But see *In re Vernon R.V.*, 1999-NMCA-125, ¶ 7 (concluding that termination is not a custody proceeding within the meaning of state child custody jurisdiction statute with different language than UCCJA).

¶ 37. Under the UCCJA, Vermont has jurisdiction to adjudicate the termination of father's parental rights. Vermont is undeniably the girls' home state because they have resided here continuously since 2003. 15 V.S.A. § 1031(5) (defining home state as the place where a child and a parent have resided "for at least six consecutive months"). Moreover, it is not suggested that any other state has jurisdiction to adjudicate father's parental rights. *Id.* § 1032(a)(4). Therefore, Vermont has statutory authority to adjudicate the dispute.

¶ 38. Next, it must be determined if exercising jurisdiction in this case would "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (quotation omitted); see *J.D.*, 923 So. 2d at 310 (considering whether status exception satisfies due process in particular situation); *State ex rel. W.A.*, 2002 UT 127, ¶ 19 (exercise of status-based jurisdiction must have both statutory and constitutional basis). Usually, this is satisfied by the "minimum contacts" requirement, which serves two purposes: protecting defendants from being forced to defend themselves in a "distant or inconvenient forum," and ensuring "that the States, through their courts, do not reach out beyond the limits imposed on them . . . as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). As noted above, even assuming the facts as alleged by the State, father's contacts with Vermont are nonexistent. The State agrees that he has never been to this state and conducts no business here.

¶ 39. In this case, however, the fairness of proceeding against father is satisfied not by his contacts with Vermont, but because the State is seeking to adjudicate the status of his children, who are within the court's jurisdiction. As explained, *supra*, ¶ 31, adjudication of the children's legal relationship to father is a determination of status like the adjudication of divorce, which is within this state's jurisdictional authority. See *In re S.A.V.*, 837 S.W.2d 80, 84 (Tex. 1992) (explaining that "a family relationship is among those matters in which the forum state has such a strong interest that its courts may reasonably make an adjudication

affecting that relationship even though one of the parties to the relationship may have had no personal contacts with the forum state").

¶ 40. Furthermore, under factors set forth by the Supreme Court, Vermont is a reasonable forum to adjudicate the status of the children. Reasonableness depends on several factors: (1) "the burden on the defendant"; (2) the forum state's interest; (3) "the plaintiff's interest in obtaining relief"; (4) the interest of the interstate judicial system in efficiently resolving the controversy; and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987) (quotation omitted). We consider each of these factors in turn.

¶ 41. First, the burden on father is recognized as considerable. As the Supreme Court of the United States explains: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114. Nonetheless, some of the burden on father of litigating in a foreign and distant forum is ameliorated by Vermont's procedural rules and statutory provisions applicable to termination proceedings. See Stoner, *supra*, at 307-08 (listing provisions of the UCCJEA that lessen the burden of litigation on out-of-state parents).

¶ 42. Weighed against father's burden is the interest of Vermont as the forum state. In its role as parens patriae, Vermont is responsible for the welfare of resident children and has a strong interest in assuring they are safe and well cared for. See *In re Marriage of Leonard*, 175 Cal. Rptr. at 909 (explaining that status jurisdiction in custody cases is based on "the right and obligation of the state in its parens patriae role to consider the welfare of the child subject to its jurisdiction and to make a determination that is in the best interests of the child"); *Caplan v. Donovan*, 879 N.E.2d 117, 123 (Mass. 2008) ("This status exception to the personal jurisdiction ordinarily required by due process reflects the importance of a State's interest in the protection of offspring within its borders."); *Wenz v. Schwartze*, 598 P.2d 1086, 1091 (Mont. 1979) (distinguishing ordinary custody cases from those "when the court stands as *parens patriae* seeking to assist the welfare of the abused, abandoned, or

neglected child"). When children are neglected or abandoned by their parents, the state is required to care for children and has an interest in resolving their status. The children and mother have resided in Vermont since 2003, and Vermont DCF has had custody of the children since 2006. Thus, Vermont has a strong interest in reaching a positive outcome for them. See *In re S.A.V.*, 837 S.W.2d at 87 (exercising jurisdiction over custody matter and relying on the state's "vital interest in protecting the rights of children within its borders and providing for their support"); cf. *In re John Doe*, 926 P.2d at 1298-99 (concluding that state's interest in adjudicating termination proceeding was insufficient to justify the exercise of personal jurisdiction over nonresident alien parent given that neither parent was a resident and child was resident only as a result of proceedings).

¶ 43. Next, we examine the plaintiff's interest. Although the children did not file this termination petition and are not technically plaintiffs, they have joined DCF's request for termination, and we consider their interest under this factor. The children's interest certainly weighs in favor of Vermont adjudicating the case given the children's long-time residence and current presence in this state. Further, if Vermont declines jurisdiction no other state will likely adjudicate this dispute, leaving the children without a means to be adopted. See *In re Thomas J.R.*, 2003 WI 61, ¶ 38 (rejecting requirement of minimum contacts for termination cases in part because it would result in "no practical forum" for child to have his status adjudicated). Thus, although "a parent's right to care for his children is a fundamental liberty interest," *In re K.M.M.*, 2011 VT 30, ¶ 24, 189 Vt. 372, 22 A.3d 423, this interest is not absolute and may be overcome. Indeed, in termination cases, "[o]ur polestar has been the best interests of the child." *In re D.R.*, 136 Vt. 478, 481, 392 A.2d 951, 952 (1978). As the Wisconsin Supreme Court emphasized:

> Children . . . need a forum in which their status can be determined. Requiring minimum contacts would often make termination of parental rights and the subsequent adoption proceedings impractical or impossible. Such a child would essentially be left in "limbo," unable to have a court adjudicate his or her status.

*In re Thomas J.R.*, 2003 WI 61, ¶ 39. The children's interest in resolving the status of father's residual rights is strong and weighs heavily in favor of Vermont jurisdiction.

¶ 44. Similarly, the interest of efficient judicial resolution of the case points to Vermont jurisdiction because there is no other state that is better suited to resolving the children's status. The children and mother are located in this state. Further, the evidence pertaining to termination is primarily, if not totally, located in Vermont.

¶ 45. Finally, we consider the interest of the several states. Within the United States, each state has expressed a strong policy choice in favor of courts exercising jurisdiction in termination proceedings based on the child's connection to the forum state rather than by requiring personal jurisdiction over both parents. This is demonstrated by every state's adoption of either the UCCJA or UCCJEA, which both base jurisdiction foremost on the child's connection to the forum state. Because Vermont is the children's home state and no other state has a connection to the children, Vermont's exercise of jurisdiction is not unreasonable.

¶ 46. The interest to be considered is arguably broader in this case, where Vermont's exercise of jurisdiction has an impact on the rights of a foreign national in another country. Therefore, we also consider "the procedural and substantive polices of other *nations* whose interests are affected by the assertion of jurisdiction." *Asahi*, 480 U.S. at 115. Even though Sri Lankan nationals are involved in the proceedings, no apparent adverse policy concern militates against Vermont adjudication since the children have not resided in Sri Lanka for several years. Thus, any interest does not outweigh the other factors weighing in favor of Vermont jurisdiction.

¶ 47. Given the patently strong interests of the state and the children, and the lack of competing states' interests, we conclude that Vermont's exercise of jurisdiction is reasonable. Vermont jurisdiction does not violate traditional notions of fair play and substantial justice. Subject to father's opportunity for further challenge, the family division has jurisdiction to adjudicate termination of father's residual parental rights to R.W. and N.W.

III.

¶ 48. Having concluded that the court erred in denying the petition to terminate father's parental rights for lack of jurisdic-

tion, there remains the question of how to proceed with the case. As explained, *supra*, ¶ 21, the termination of father's rights was not adjudicated at the final hearing, but was sought by DCF in a post-judgment memorandum. DCF argued that the court had jurisdiction and further that the record provided sufficient evidence to terminate father's rights because it unequivocally showed that he "has had no involvement with the children since each has come to the United States — and possibly little involvement prior to that." On appeal, DCF continues to argue that father's rights can be terminated because the record indisputably demonstrates that "he has played no constructive role in their lives."

¶ 49. We conclude that given the lack of a hearing regarding father and the consequent lack of any findings by the trial court on the facts relevant to father, there is no basis for this Court to terminate father's rights. DCF's reliance on *In re K.F.*, 2004 VT 40, 176 Vt. 636, 852 A.2d 584 (mem.), is misplaced. In that case, the father argued that the trial court erred in concluding that termination was in his child's best interest because the court based its decision on factors he alleged were beyond his control. *Id.* ¶ 11. We rejected that argument because the evidence supported the court's findings that the father bore sole responsibility for his unavailability to his children and nonparticipation in services. *Id.* ¶ 12. Unlike the situation in *K.F.*, here, there is no factual record on which we can review DCF's allegations regarding father's lack of involvement in his children's lives. Father has not been represented and has had no opportunity to participate and present evidence. Thus, the trial court has not made findings on the evidence related to father.[7] Without a record, we decline to grant termination in the first instance. Therefore the matter is remanded to the trial court for a hearing on termination of father's rights.

¶ 50. Because further hearings will be required to resolve the issue of father's parental rights, we need not consider whether DCF conducted due diligence prior to serving father by publication with notice of the first termination hearing. The putative

---

[7] While it is important to satisfy the due process rights of parents, the best interests of children must also be satisfied. Therefore, as long as the State uses due diligence to contact parents outside of Vermont, the lack of response should be no impediment to proceeding with termination if that is in the children's best interests.

father's attempt to participate at the last hearing suggests that he is available and that his whereabouts are reasonably discoverable. Thus, on remand, DCF must exercise due diligence anew in attempting actual notice to father before resorting to service by publication. V.R.C.P. 4(g)(1); see *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) (explaining that service by publication is not preferred but may be used if defendant's whereabouts cannot be ascertained with due diligence). This includes seeking the assistance of mother and other known relatives who may have contact information for father. See *In re D.F.*, 2007 SD 14, ¶¶ 9-10, 727 N.W.2d 481 (explaining that due diligence depends on circumstances of a particular case but should include inquiry of relatives).

¶ 51. We also note that the Vienna Convention on Consular Relations obligates the United States "to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor or other person lacking full capacity who is a national of the sending State." Vienna Convention on Consular Relations, art. 37, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. Pursuant to the Supremacy Clause, this treaty is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Because both children are Sri Lankan citizens, the treaty requires DCF to notify the Sri Lankan consulate about the pending child neglect proceedings. See *In re Antonio O.*, 784 N.W.2d 457, 467 (Neb. Ct. App. 2010) (advising state social welfare department to put procedures in place to notify foreign consulate when foreign minor is involved in juvenile proceedings). Following an order of this Court during the pendency of this appeal, DCF provided the Sri Lankan consulate with the necessary notice.[8]

¶ 52. We decline to delineate how the court should engineer father's participation on remand because the exact method chosen will depend upon facts that cannot be known at this stage. See *M.Y.J.P.*, 823 A.2d at 841-43 (noting that due process involves

---

[8] We note that mother waived this issue, having neither raised it below nor on appeal. In any event, failure to give notice to a consulate, even when required by the Vienna Convention, does not invalidate jurisdiction assumed without such notice. See *In re Stephanie M.*, 867 P.2d 706, 712-13 (Cal. 1994).

balancing of several factors and deferring to trial court's choice of procedure). Given father's apparent efforts to contact the court, the family division can now anticipate a response from the putative father and make advance arrangements for his participation, including removal to a better equipped courtroom, arrangements for his appearance by telephone, provision for any necessary interpreters for father and for the court, and assignment of counsel.

¶ 53. Finally, the termination petition cannot be decided upon default. V.R.F.P. 2(a)(2), 3(a) (exempting application of Rule of Civil Procedure 55 concerning default judgments from application to termination proceedings). Therefore, if father fails to appear, DCF is still required to present evidence supporting the petition, and the court must make findings on the best interests of the children by clear and convincing evidence. 33 V.S.A. § 5114(a) (explaining that *"any time* a petition or request to terminate all residual parental rights of parent" is made, the court is required to consider the best interests of the child (emphasis added)); see *In re Termination of Parental Rights to Torrance P.*, 2006 WI App 55, ¶ 6, 711 N.W.2d 690 (noting that even where a parent defaults and fails to appear, the court must hold an evidentiary hearing and determine that there are grounds to terminate by clear and convincing evidence).

¶ 54. In sum, termination of parental rights is a determination of status and may be adjudicated when the forum state has a sufficient connection to the children, even absent minimum contact jurisdiction over a parent. Further, in this case, we hold that exercise of jurisdiction is authorized by the UCCJA and is reasonable given the strong interests of the state and the children in resolution of father's rights as well as the lack of any conflicting jurisdictional claims by another state or country.

*Reversed and remanded for further proceedings as to both mother and father.*

¶ 55. **Dooley, J.,** concurring. I concur in the majority's resolution of mother's appeal. As to father, I agree that the trial court erred in dismissing the termination petition for lack of jurisdiction and therefore concur that the case should be remanded for further proceedings. However, I am concerned with the procedures implemented in this case, which wholly deprived father of a

meaningful opportunity to participate in the case and may have undermined the best interests of the children. It appears from the record that neither the court nor the Department for Children and Families (DCF) made any effort to locate and notify father of the proceeding to adjudicate his girls as children in need of care or supervision (CHINS) until the eleventh hour when the termination petition was already pending. Once father was contacted, the court rejected his attempt to appear by telephone, again precluding father's participation. While the factual scenario is new to this Court, the significant numbers of foreign-born minors in this country and foreign-born citizens in this state generally means that the international complications present in this case are not unique and will likely arise again.[9] Thus, I write separately to emphasize where this case has gone in the wrong direction and the steps that must be taken in child neglect proceedings to secure the rights of foreign minors and their noncustodial parents — including those who are foreign nationals. I also address questions that will likely again arise on remand regarding father's participation in this case.

¶ 56. The most striking deficiency in this case is the total lack of notice to father of the neglect proceedings involving his children.[10] This is a classic case of notifying a parent of a juvenile proceeding for the sole purpose of terminating the parental rights of the parent. DCF obtained custody of the children based on an emergency detention order issued on June 9, 2006. Yet, the record reveals that the first time DCF attempted to contact father was in January 2010 to give him notice of DCF's petition to terminate

---

[9] According to the U.S. Census Bureau, in 2009, there were 1,865,000 foreign-born children fourteen years and younger living in the United States. U.S. Census Bureau, Statistical Abstract of the United States: 2011, at 44 tbl. 40, available at http://www.census.gov/compendia/statab. In addition, the Census Bureau reports that in Vermont 3.9% of the population is foreign-born. *Id.* at 43 tbl. 38.

[10] In making statements about notice to father, I am relying on the record before us. I recognize, however, that the record may be incomplete. For example, while we had no record that DCF notified father of the pendency of this appeal until this Court ordered such notice, an affidavit from an assistant attorney general expressly indicates that she did in fact send a copy of her brief to father by mail. I would encourage DCF to make all contacts with father part of the record.

parental rights.[11] At that point, the children had been in DCF custody for three and a half years.

¶ 57. Such a delay is contrary to Vermont law, which directs that parents, even noncustodial ones, be notified at the early stages of any child neglect proceeding. Under the statutes in effect at that time, a copy of the June 2006 detention order should have been delivered to father as the girls' parent. 33 V.S.A. § 5513(b) (repealed 2009)[12] (directing that an order placing a child into custody should be delivered to "a parent . . . if they can be found"). Furthermore, the court had an independent obligation to "make reasonably diligent efforts to locate noncustodial parents and notify them of hearings held pursuant to this chapter." Id. § 5519a. The early notification requirement is echoed by the Uniform Child Custody Jurisdiction Act (UCCJA), which directs that a court must provide "reasonable notice and opportunity to be heard . . . to . . . any parent whose parental rights have not been previously terminated" before issuing a decree in "child neglect and dependency proceedings." 15 V.S.A. §§ 1033, 1031(3).[13] For unexplained reasons, however, there was no attempt by the

---

[11] The record contains no indication that the State tried to serve father with notice of the CHINS proceeding, even by publication. In its brief, DCF states: "During all of this time [that the CHINS case was pending], DCF was unable to ascertain father's whereabouts, beyond the general fact of his continued residence in Sri Lanka." The first action to notify father of the proceeding shown by the record was the assignment of an investigator from the Office of the Attorney General to locate father for purposes of notifying him of the termination hearing. The investigator's attempt and failure to locate father is detailed in an affidavit which DCF used to justify notice of the termination hearing by publication.

[12] In 2008, the Legislature revised the statutes related to juvenile proceedings. See 2007, No. 185 (Adj. Sess.), eff. Jan. 1, 2009. The current statute specifically designates that following an emergency care order, DCF is required to "make reasonable efforts to locate any noncustodial parent and provide the noncustodial parent with the emergency care order or conditional custody order, notice of the date, hour, and place of the temporary care hearing, and right to counsel." 33 V.S.A. § 5306(b). The statute requires further that: "If the noncustodial parent cannot be located, [DCF] shall provide to the court a summary of the efforts made to locate the parent." Id.

[13] The Legislature recently repealed the UCCJA and adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), effective July 1, 2011. 15 V.S.A. § 1096. The UCCJEA states that motions "commenced before the effective date . . . [are] governed by the law in effect at the time the motion or other request was made." Id. Because DCF filed the petition to terminate father's rights prior to July 1, 2011, the UCCJA, not the UCCJEA, applies to father's termination hearing.

court or DCF to locate or contact father prior to January 2010. As the majority decision notes, when DCF finally tried to give notice to father, its method was inadequate and ineffective. DCF conceded in the trial court that father finally received actual notice of the termination from the lawyer for DCF by electronic mail.

¶ 58. Equally disturbing is that no counsel has ever been assigned to father, neither in the trial court nor in this Court. Thus, we are issuing this very important decision based on an ex parte presentation by DCF. A needy parent in a termination proceeding is entitled to a public defender "when the court deems the interests of justice require representation." 13 V.S.A. § 5232(3); see *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27-32 (1981) (holding that constitutional right to counsel in parental termination proceedings determined on a case-by-case basis). Certainly, once DCF filed for termination and father had initiated contact via electronic mail with both the DCF caseworker and the DCF attorney, the court should have taken steps to determine if father could afford Vermont counsel and to assign an attorney to represent father's interest, could he not afford one. This Court notified father of the appeal and his right to counsel by electronic mail and sent father an application for public defender services. Father has not, however, responded. In my judgment, resolving father's right to representation has to be the first step on remand.

¶ 59. The three-and-a-half-year delay in notifying father has prejudiced him in several ways, some of which cannot be remedied by our remand. First, it obviously deprived father of an opportunity to participate personally or through an attorney from the beginning of the proceedings. Second, it precluded consideration of him, or possibly other Sri Lankan relatives he might have suggested, as an alternative placement for the children. Third, and most irreparably, father's prolonged separation from his children makes reunification with him more unlikely given the increasing time it would take for him to develop a bond with them and the positive relationships the girls have developed with their foster families in the interim. See 33 V.S.A. § 5114(a) (listing best-interests factors to include child's relationship with parents and foster parents, parent's ability to resume parenting within reasonable period of time, and parent's role in children's lives). Because of father's lack of notice, the circumstances of father's relationship to his children are unknown. Thus, at this stage, it is impossible

to wholly determine the level of communication and interest father has displayed towards the children and to what extent his absence from their lives is attributable to his own inaction. See *In re A.D.T.*, 174 Vt. 369, 377, 817 A.2d 20, 26-27 (2002) (affirming termination of father's parental rights where he had "completely refused to have any relationship with, or to take responsibility for, his child"); see also *In re C.L.*, 2005 VT 34, ¶¶ 15-16, 178 Vt. 558, 878 A.2d 207 (mem.) (considering unwed father's level of interest and extent of efforts to assert paternity in terminating father's rights to child). Nonetheless, prompt notice to father would have allowed him to present his version of the facts and to have an opportunity to involve himself in the children's lives. We can only speculate whether an appropriate option to meet the best interests of the children may have been to return them to Sri Lanka.

¶ 60. I am cognizant that DCF has asked us to take the unusual step of terminating father's parental rights without a remand to the family division. It justifies this request because "Father's connection to the children is purely biological; he has played no constructive role in their lives and there is no indication that he could or would, at any point in the future, assume a parental role with either of the children." DCF takes this position after its lawyer received an email from father that explained his inability to obtain a visa to come to the United States and that asked: "Please . . . ask for a long date from the court to enable me to get a visa and claim my right to my two daughters. I need them and I love them. Please help me." In fact, other than the email, there is no evidence in the record to show whether father could or would assume a parental role in the future precisely because DCF never investigated the issue and father had no opportunity to address it.

¶ 61. In addition to failing to notify father, neither DCF nor the court took measures to contact Sri Lanka regarding the children, who were — and continue to be — citizens of that country. As the majority notes, international law required that the Sri Lankan consulate be notified. See Vienna Convention on Consular Relations, art. 37, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (specifying that receiving state has a duty to notify consulate of foreign state "where the appointment of a guardian or trustee appears to be in the interests of a minor" who is a national of the foreign state). While this notice has now been supplied, pursuant to the treaty, notification should have been provided as soon as the children were taken into DCF custody.

¶ 62. On a broad scale, notification is important for maintaining international comity. See *People v. Madej*, 739 N.E.2d 423, 431 (Ill. 2000) (McMorrow, J., concurring and dissenting) (emphasizing that "[i]t is in our own self-interest to uphold the principle of international comity" regarding consular notification under Article 36 of the Vienna Convention). This country's compliance encourages other countries to provide the same service to American minors within their jurisdictions. "[W]e cannot expect that the citizens of this country, while abroad, will be afforded their rights under the Vienna Convention, or indeed, under any treaty, if we do not afford those same international rights to foreign nationals here in the United States." *Id.* For example, if the situation were reversed and an American child was taken into custody by a Sri Lankan social services agency because her American parent was deemed unfit, certainly one would expect authorities there to contact the American consulate at the earliest possible time.

¶ 63. As it relates to this particular matter, notification is important because it would allow Sri Lanka to assist in locating other individuals who could act as guardians or custodians for the children, including father. See *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 842 (Mo. 2011) (Wolff, J., concurring and dissenting) ("We should view the consulates of foreign governments as sources of help in these situations."); *In re Angelica L.*, 767 N.W.2d 74, 97 (Neb. 2009) (Gerrard, J., concurring) ("This [termination] case, for instance, might have proceeded far differently had Guatemalan consular officials been appropriately and actively engaged in the process from the beginning."); see generally C. Delphin, Comment, *Protecting the Interests of Foreign-National Minors in the United States Through Consular Notification*, 45 New Eng. L. Rev. 941, 953-54 (2011). Such notification is in keeping with the overall philosophy of communication encompassed in both the UCCJA and UCCJEA. See 15 V.S.A. § 1035 (2010) (under UCCJA court is directed to communicate with other states where proceedings concerning child are pending); 15 V.S.A. §§ 1068, 1070 (encouraging communication and cooperation between interested courts under UCCJEA). This cooperation is the key to avoiding conflicts between jurisdictions. Importantly, early notification to father and Sri Lanka serves the children's best interests by identifying all possible custodians at an early stage, adjudicating their appropriateness to parent, and thus facilitating a more expedient resolution of permanency for the children.

¶ 64. Going forward, if father responds to the notice and elects to participate, due process demands that he be provided with an opportunity to be heard at the hearing. 15 V.S.A. § 1033 (2010) (under UCCJA, before an order can issue, parent must be provided with "notice and opportunity to be heard"). Father's actual presence is not, however, required, and his participation may be satisfied through other means. See *Div. of Youth & Family Servs. v. M.Y.J.P.*, 823 A.2d 817, 841-42 (N.J. Super. Ct. App. Div. 2003) (explaining that procedural requirements for parental termination cases are heightened, but "do not confer a constitutional right of confrontation or mandate a parent's presence at trial" and noting that particular situation may allow for participation by telephone or deposition).

¶ 65. To the extent that father seeks to participate remotely, the relevant law supports this request. The UCCJA states: "In addition to other procedural devices available to a party, any party to the proceeding . . . may adduce testimony of witnesses, including parties and the child, by deposition or otherwise, in another state." 15 V.S.A. § 1046 (2010); see *id.* § 1051 (specifying that UCCJA terms apply to "international area").[14] At the prior hearing, the trial court applied Family Rule 17 on telephone procedures to bar father's apparent request to appear by telephone because it was not satisfactorily assured of the adequacy of its technology or of father's identity. On remand, I believe these concerns can be easily remedied, especially given that they are now known in advance. Any technology concern can be alleviated by scheduling father's appearance in a properly equipped courtroom. As to identification of father, the court can satisfy this requirement in a variety of ways including through the testimony of an individual, such as mother, who is familiar with father's voice

---

[14] Even though not applicable to this case, the UCCJEA revisions may be used as a guide for the parties and court given the more explicit instructions on accommodating a remote party. See 15 V.S.A. § 1063(b) (providing that a "Vermont court shall treat a foreign country as if it were a state of the United States" for purposes of applying relevant provisions on accommodation). For example, documentary evidence from outside the state can be admitted even if transmitted by technological means not producing an original. *Id.* § 1069(c). In addition, the court may allow the testimony of a witness located in another state to be taken "by deposition or other means allowable in Vermont for testimony taken in another state." *Id.* § 1069(a). Alternatively, an individual in another state may "be deposed or [permitted] to testify by telephone, audiovisual means, or other electronic means before a designated court or at another location in that state." *Id.* § 1069(b).

or by having father appear in Sri Lanka at a site where an official can confirm father's identity based on photographic documentation. With these accommodations in mind, the trial court can resolve the termination petition in a timely fashion while still preserving father's right to meaningful participation.

¶ 66. As I noted above, I think it more and more likely that our child welfare system will be required to intervene to protect children who are citizens of another country and whose parent(s) and other relatives reside in that country. The system has to protect the rights and interests of a parent or relative who resides in the foreign country and, importantly, evaluate whether the interest of the child would be better served by a living arrangement in the country of the child's citizenship. Realistically, if the parent involved in this case is to have a meaningful role in the life of his daughters, he has to move here or the children must return to Sri Lanka. I do not underestimate the difficulty of making the best choices for the children while protecting the interests of foreign parents in these circumstances. I concur to stress the urgency and importance of overcoming that difficulty.

¶ 67. I am authorized to state that Justice Johnson joins this concurrence.