*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-476

MARCH TERM, 2014

| In re E.C., Juvenile | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Orleans Unit, |
| | } | Family Division |
| | } | |
| | } | DOCKET NO. 29-6-09 Osjv |
| | | |
| | | Trial Judge: M. Kathleen Manley |

In the above-entitled cause, the Clerk will enter:

Father appeals from a family court judgment terminating his parental rights to minor E.C. He contends that the trial court: (1) improperly shifted the burden of proof on the issue of whether he could resume parental responsibilities within a reasonable period of time; (2) erroneously relied on inadmissible and unreliable "pseudo-scientific" evidence; and (3) impermissibly terminated father's parental rights on the basis of his incarceration. We affirm.

The facts may be summarized as follows. E.C. was born in June 2003, and was ten years old at the time of these proceedings. He was taken into emergency custody by the Department for Children and Families at the age of six after being found alone on a street at 1:00 a.m., looking for father, with whom he was staying. The court issued an emergency care order, and the child was placed in foster care. The following month, he was placed with a couple who had been his daycare providers, the Morses, pursuant to a conditional care order. Father was convicted of reckless endangerment as a result of the incident. There had been prior reports from E.C.'s school concerning issues of neglect, inadequate clothing, sexualized acting out, and hygiene.

At the time of the incident, mother had a long history of mental health and substance abuse issues, and was homeless. Father was on probation for domestic assault, and was subsequently re-incarcerated. An adjudication of CHINS was made in November 2009. E.C. remained in the care of the Morses, and the court approved a case plan calling for father to engage in substance-abuse assessments and domestic-violence and parenting programs as available, with a goal of reunification by July 2010. In July 2010, the court approved a modification of the permanency goal to Alternate Planned Permanent Living Arrangement with the Morses, due to the parents' continued inability to care for E.C. Mother's whereabouts were unknown. Father had since been incarcerated on several occasions for violations of probation resulting from drug use and failure to attend substance abuse counseling, as well as additional drug charges. He had failed to follow through on the required substance abuse assessments, and had not regularly stayed in contact with E.C. by calling or writing despite encouragement by DCF and others to do so. E.C. remained with the Morses until they became unable to care for him due to health issues in February 2013. The court then approved a transfer of custody back to

DCF, and E.C. was placed temporarily with the Morses' son and his family, who had expressed an interest in adoption.

A petition to terminate parental rights was filed in April 2013, and a hearing scheduled for September 2013. Shortly before the hearing, E.C. was placed in a therapeutic high-risk foster home with experienced child-care providers to address his behavioral issues and special needs.

Following the evidentiary hearing, the court issued a written decision in November 2013. The court found that, while living with father, E.C. had been exposed to domestic violence, substance abuse, and neglect. The court noted that from June 2009, when E.C. was taken into DCF custody, until the hearing in September 2013, father had been incarcerated on ten separate occasions for a period of well over half of the time in question. Father remained incarcerated at the time of the hearing and was not scheduled for release until July 2014. The court further found that, despite the encouragement of DCF and others to remain in contact with E.C., father had sent him only one letter and attended only a few visits, while missing or cancelling others. Based on the testimony of the child's therapist, school counselor, and DCF social worker, the court found that father's repeated incarcerations, unpredictable absences, and minimal contacts had contributed to E.C.'s extreme anxiety, fears of abandonment, attachment issues, and emotional instability. Although father had completed a number of behavioral and parenting programs while incarcerated, the court noted that—despite all of the programming—he was re-incarcerated in June 2013, following his latest release, for violation of probation. E.C.'s therapist, DCF social worker, and school counselor all testified to his resilience, but also his need for stability and permanence.

The court concluded that, although father undoubtedly loves E.C., he had played no constructive role in his life for years; that, as a result of father's neglect and absences, E.C. had suffered significant loss and trauma which had adversely affected his emotional health and necessitated significant counseling and support in his day to day activities; that father had failed to provide E.C. with physical, emotional, or financial support for the last four years, despite opportunities to do so; and that, based on the foregoing, there was no reasonable likelihood that father would have the ability to resume parental responsibilities and provide the support that E.C. required within a reasonable period of time. Accordingly, the court concluded that termination of father's parental rights was in the child's best interests, and granted the petition.[1] This appeal by father followed.

Father initially contends the trial court improperly shifted the burden of proof to him to demonstrate that he could resume parental responsibilities within a reasonable period of time. The burden of proving by clear and convincing evidence that a termination of parental rights is in the best interests of the child rests, of course, with the State. 33 V.S.A. § 5317(c); In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108. In asserting that the trial court here impermissibly shifted the burden, father cites a portion of one sentence in the court's decision, which reads: "There is little if any support for the belief that [father] will be available to assume or resume parental duties within a reasonable time . . . ." Father argues based on this statement that the "court's analysis focused not on what the state had proved, but what the father had not."

The claim lacks merit. Indeed, it is refuted by the very sentence on which father relies, which reads, in its entirety, as follows: "There is little if any support for the belief that [father]

_____

[1] Mother had voluntarily relinquished her parental rights prior to the hearing.

will be available to assume or resume parental responsibilities within a reasonable time; a role he has not fulfilled in over four years." (Emphasis added.)  As the underscored language suggests, the court's conclusion on this critical point was based on the extensive record evidence of father's serial incarcerations, many resulting from probation violations, and chronic failure to maintain even the most minimal emotional contact with, and support for, the child over many years.  In referring to the lack of "any support for the belief" that father could resume parental responsibilities, it is clear that the court was simply commenting on the state of the record, not impermissibly shifting the burden of proof.  See In re B.C., 169 Vt. 1, 14 (1999) (holding that, "[i]n noting the absence of any credible evidence that grandmother could assume the role of parent, the court was merely commenting on the state of the evidence, not signaling that it was grandmother's burden to prove her fitness").  Accordingly, we find no error.

Father next asserts that the trial court erred by admitting and relying on evidence of "pseudo-scientific dream analysis."  The testimony in question was given by E.C.'s therapist, who testified that he had worked with E.C. for three years, described the anxiety and trauma that father's absences had caused him, underscored E.C.'s need for stability and predictability, and expressed doubt as to father's ability to provide that stability and predictability.  In his direct testimony, the therapist noted that E.C. had "experienced nightmares at times," and on further examination by the child's attorney was asked whether "father figure[s] into those nightmares."  The therapist explained that the nightmares had been "about monsters stealing him, which often is a theme for unpredictability," but when asked directly whether "the monster was his father" the therapist unequivocally answered "No."  He explained that the monster figure could not be viewed "literally as a person," but instead as a general expression of the child's "anxiety."

Father acknowledges that no objection was raised to the testimony, but asserts nevertheless that the witness was not qualified to provide an "expert" opinion on "dream analysis," that such evidence constitutes inadmissible "junk science," and that its admission here was plain error and warrants reversal.  The argument is unavailing.  Even assuming that the plain-error doctrine applies in this civil context, it is reserved for the "exceptional case[]" where the error implicates fundamental rights.  In re D.C., 157 Vt. 659, 659 (1991) (mem.).  Here, the therapist expressly disavowed any suggestion that the figure in the dream represented father or any other person, and the trial court's decision makes no mention of the so-called "dream analysis," noting only that E.C. had experienced nightmares and that father's frequent and unpredictable absences had caused the child worry and feelings of abandonment, an observation which father does not suggest was outside the scope of the therapist's competence.  Accordingly, we discern no possible prejudice to father's interests as a result of the testimony, and hence no basis to disturb the judgment.  See In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 (noting that we will reverse termination-of-parental rights judgment only where error affected a party's substantial right).

Finally, father contends that the trial court impermissibly terminated his parental rights on the basis of his incarceration.  He argues that it was improper for the court to make his incarcerations and projected date of release a "determinative factor" in its analysis, and to overlook the evidence that his incarceration "was actually a time of great personal growth and recovery."  It is evident from the court's decision, however, that it did not rely on father's frequent incarcerations or release date as evidence of unfitness or grounds for termination per se.  The court focused, rather, on the impact of these incarcerations on E.C. and father's relationship with him, noting not only that father had failed to provide emotional and physical support while incarcerated, but that he had failed to make any real effort to maintain an emotional bond with

E.C. by consistently writing, calling, or visiting when able, despite encouragement by DCF and others to do so, and that he would remain unavailable to the child for another eight months until his release in July 2014. This was a permissible and sound basis for the decision. See, e.g., In re J.L., 2007 VT 32, ¶ 16, 181 Vt. 615 (mem.) (holding that trial court properly relied on father's lengthy incarceration, projected release date from prison one year after termination hearing, and consequent lack of relationship with child in granting petition to terminate parental rights); In re K.F., 2004 VT 40, ¶ 6, 176 Vt. 636 (mem.) (holding that court properly relied on father's "demonstrated . . . pattern of unavailability due to incarceration [and] criminal behavior" in finding that he had not played a constructive role in child's life and could not resume parental responsibilities within reasonable time).

As for father's completion of programming while incarcerated, the trial court acknowledged the achievement but noted that three months after his most recent release in March 2013, his furlough was revoked and he was re-incarcerated for violating a condition of probation. The record thus showed that, notwithstanding father's completion of programming, he was unable to refrain from conduct leading to re-imprisonment, and this in turn supported the conclusion that there was no likelihood that father would be able to resume parental responsibilities within a reasonable period of time. Accordingly, we find no basis to disturb the judgment.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice

4