VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    24-AP-206



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

DECEMBER TERM,   2024

| | |
|---|---|
| In re B.S., Juvenile<br>(J.E., Mother\* & J.S., Father\*) | } APPEALED FROM:<br>}<br>} Superior Court, Chittenden Unit,<br>} Family Division<br>} CASE NO. 22-JV-01495<br>Trial Judge: Elizabeth Novotny |

In the above-entitled cause, the Clerk will enter:

Mother and father appeal from the termination of their parental rights in son B.S.  We affirm.

### I.  Procedural History

B.S. was born in November 2016.  Mother has three other children whom she has not parented since 2011; father has at least one other child, who is an adult.  The Department for Children and Families (DCF) first filed a petition alleging that B.S. was a child in need of care or supervision (CHINS) in 2019 based on parental substance abuse, homelessness, and other concerns.  B.S. was taken into DCF custody and placed with a foster parent.  Parents obtained housing and engaged in services and reunited with B.S. in January 2021.

DCF filed a second CHINS petition in October 2022.  Father was incarcerated at the time.  DCF learned of domestic violence in the home between mother and father's adult daughter.  On a subsequent DCF visit, mother was found passed out or asleep in the garage while B.S. was unsupervised in the home.  Police confiscated drugs and drug paraphernalia; mother admitted that she relapsed and was struggling with crack-cocaine use.  DCF obtained emergency custody of B.S. and placed him in his previous foster home.  Parents stipulated that B.S. was without proper parental care.  The court adopted a case plan in February 2023 with a goal of reunification with either parent within six-to-nine months.  Among other action steps, parents were required to undergo substance-abuse and mental-health assessments, engage in recommended treatment, sign releases for their treatment, remain law-abiding citizens, obtain safe housing, engage in parent coaching, and attend visits with B.S.

In August 2023, the State filed a petition to terminate parents' rights. The court held a half-day hearing in late February 2024 and a second full-day hearing in April 2024. As discussed in greater detail below, father was incarcerated during these hearings. He appeared remotely via Webex at the first half-day hearing, and he attended the second hearing day in person. Mother appeared in person both days, although she arrived late on the second day.

The court concluded that parents stagnated in their ability to parent and that termination of their rights was in B.S.'s best interests. It made numerous findings in support of its decision, only one of which is challenged on appeal. The court's findings include the following. Parents have struggled for many years with substance-use disorders, including using crack cocaine. Father began abusing substances at age thirteen and mother abused substances for so many years that she could not recall when she started. Parents continued to use illicit drugs after B.S. was born and during these juvenile proceedings and they failed to obtain sobriety, recovery, or remission.

Parents failed to comply with the case-plan requirements. They did not engage with the action steps or engage in any meaningful way with DCF. Father failed to: secure safe and stable housing; comply with conditions imposed by the Department of Corrections; remain a law-abiding citizen; refrain from substance use; complete requested drug tests; complete a substance-use assessment or recommended treatment; or participate in mental-health counseling. He was incarcerated for eight of the sixteen months that B.S. was in DCF custody. While incarcerated between 2022 and February 2023, the court found that father made no effort to contact DCF family-service workers by phone or letter. DCF attempted unsuccessfully to contact father. Father did not maintain contact with DCF after his release. He resumed using drugs, including crack cocaine. Father was reincarcerated in December 2023 on new charges. His projected early release date was December 2024.

Mother similarly failed to: consistently visit B.S.; execute provider releases; locate safe and stable housing; or engage in counseling, drug testing, and drug assessments. Mother often behaved erratically during visits with B.S. and the court found that her chronic drug use was the sole source of her inability to reliably visit B.S. She continued to use illicit drugs during the pendency of this case, including crack cocaine.

Parents last had contact with B.S. in January 2024. Prior to that time, parents' visitation with B.S. was inconsistent and intermittent. They repeatedly failed to attend scheduled visits, which caused B.S. stress and anxiety. Parents' visitation was reduced as a result. B.S. was bonded with his foster parent and doing well in her care.

The court explained that on the first day of the termination hearing, mother's demeanor during her testimony was initially combative, nonresponsive, and defensive. The court gave mother an opportunity to collect herself because she was refusing to answer questions in a responsive manner. After a substantial break, mother's counsel reported that mother was curled up on the floor in the attorney-client room and refusing to resume testifying. After some discussion with the court, mother resumed testifying and during this portion, she was responsive and direct. Unfortunately, the court continued, this testimony established that mother was actively using illicit drugs such as crack cocaine, she was unemployed, had no source of income, and lacked safe and stable housing. The court found that mother could not care for herself, let alone a child. Mother nonetheless denied having a substance-use disorder that required inpatient treatment. Father also struggled to acknowledge his substance-use disorder. His inability to

appreciate the consequences of his drug use only contributed to his inability to get the treatment he needed.

The court found that parents and B.S. loved one another. As detailed above, however, parents did not comply with the case plan and they stagnated in their ability to parent. Turning to the statutory best-interests factors, the court concluded that they all supported termination of parents' rights. See 33 V.S.A. § 5114(a). The most important factor—parents' ability to resume parenting within a reasonable time as measured from B.S.'s perspective—weighed heavily in favor of termination. Father had not exercised parental responsibilities for B.S. in years and even if he was not incarcerated, he could not resume parental duties within a reasonable time. Most significantly, parents would need to engage in treatment and counseling concerning their substance use, which had impacted every aspect of their lives. It was highly likely that father would refuse treatment and counseling and return to using drugs upon release from prison. Mother similarly had refused treatment and counseling in the past and continued to use drugs. Mother failed to show that she could show up consistently as a caring and reliable parent who could meet B.S.'s social, emotional, medical, and educational needs. The court found that B.S. needed and deserved permanency after eighteen months in custody. For these and other reasons, the court concluded that the termination of parents' rights was in B.S.'s best interests. Both parents appealed.

## II. Arguments on Appeal

### A. Mother's Arguments

We begin with mother's arguments. Mother argues that the court forced her to continue testifying on the first day of the termination hearing and denied her the right to "effectively participate in the proceedings and provide fulsome testimony." Mother contends that she should have been deemed incapable of expressing herself under Vermont Rule of Evidence 601(b), the hearing should have been continued, and her due-process rights were violated. She suggests that she could not consult with counsel due to her emotional upset.

Mother did not preserve these arguments and we will not consider them for the first time on appeal. See In re A.S., 2016 VT 76, ¶ 5, 202 Vt. 415 (per curiam) ("Arguments not raised below will not be addressed for the first time on appeal."). Counsel did not ask the court to disqualify mother as a witness under Rule 601, she did not argue that mother's due-process rights would be violated by continuing the hearing, and she did not object when mother voluntarily resumed testifying after a break.

Even if we were to reach mother's arguments, we would find them without merit. As recounted above, the trial court gave mother an opportunity to collect herself after mother became emotionally upset during her testimony. Her attorney sought a continuance to allow mother to engage in inpatient substance-abuse treatment so that she could "meaningfully participate." The court acknowledged that mother was upset, although it found the connection between her emotional upset and the desire for inpatient treatment unclear. Mother and her attorney denied that mother was impaired and unable to testify for that reason, and mother did not have an appointment to be admitted to an inpatient treatment facility. Mother did not refuse to testify and the court did not force her to testify. She voluntarily resumed her testimony without objection after a break. As the court found, moreover, mother testified clearly and directly when she returned to the stand. There was no showing that mother was "incapable of expressing [herself] concerning the matter so as to be understood by the judge." V.R.E. 601(b).

3

Mother chose not to offer any additional testimony at the second hearing day in April. The record plainly reflects that mother had a meaningful opportunity to participate in the hearing and to confer with counsel and there was no error. See In re C.L.S., 2020 VT 1, ¶ 25, 211 Vt. 344 ("[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (alteration in original) (quotation omitted)).

## B. Father's Arguments

We thus turn to father's arguments. Father provides his version of events, suggesting that DCF was to blame for his lack of engagement. He contends that the court "antagonized" his attorney and conducted the first hearing day in a way that was not sufficiently "trauma informed." Father cites 33 V.S.A. § 3403(a), which created a "Director of Trauma Prevention and Resilience Development . . . for the purpose of directing and coordinating systemic approaches across State government that build childhood resiliency and mitigate toxic stress by implementing a public health approach," and notes that the director is charged in part with "collaborat[ing] with both community and State partners, including the Agency of Education and the Judiciary, to build consistency between trauma-informed systems that address medical and social service needs and serve as a conduit between providers and the public," id. § 3403(b)(2). Father argues that appearing remotely for the first half-day of the termination hearing traumatized him, prejudiced his defense, deprived him of due process, and restricted his ability to communicate with his attorney and participate in his defense. He also asserts that the court erred in finding that he made no effort to contact DCF family services workers by phone or letter while he was in jail and after he was released. He does not cite to any evidence from the termination hearing in support of this assertion.

To the extent these arguments were preserved, we find them at odds with the record and without merit. The court made numerous findings about father's repeated incarcerations and his lack of engagement in this case and these findings are supported by the record. As set forth above, father was incarcerated for eight of the sixteen months that B.S. was in custody. When he was not incarcerated, father's contact with B.S. was inconsistent and intermittent. Father continued to use drugs and engage in criminal activity. While father offered various excuses for why he missed visits with B.S., the court found that his explanations failed to justify the chronic lapsed visits with B.S. His last contact with B.S. was in January 2024 and father could not recall his last in-person visit with B.S., which occurred in November 2023. The court made detailed findings about father's contact, through mother, with B.S. while father was incarcerated. The court credited the DCF case worker's testimony that neither parent sent B.S. many cards or letters other than an occasional birthday card. It noted that father's failure to have in-person visitation with B.S. was due to the fact of his incarceration and DOC's parent-child visitation policies. The court found that father's incarceration was the direct result of father's choices and conduct.

Father is responsible for his lack of engagement and his lack of progress in addressing the case-plan goals. His lack of engagement is well-supported by the record and to the extent father contends otherwise, we reject that argument. Putting aside the lack of specificity in his brief regarding specific failures related to trauma-informed process and his failure to show that any of these arguments were raised below, we reject his contention that he was "set up to fail" or that he was harmed by an insufficiently trauma-informed court process. Even if the court erred in describing father's efforts to contact DCF, which father has not shown, the error would be harmless. In re B.S., 163 Vt. 445, 454 (1995) (explaining reversal not warranted where, excluding challenged finding, remaining findings support court's conclusion). The court applied

4

the appropriate legal standard and its decision that termination of father's rights is in B.S.'s best interests is amply supported by the unchallenged findings and the evidence. See In re G.S., 153 Vt. 651, 652 (1990) (mem.) ("As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings."); In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights . . . .").

The court did not err or violate father's rights when father proceeded remotely on the first hearing day. We have not held that a parent has an absolute right to appear in person at a termination hearing. See In re R.W., 2011 VT 124, ¶ 64, 191 Vt. 108 (Dooley, J., concurring) (explaining "due process demands that [parent] be provided with an opportunity to be heard at the [termination] hearing" but parent's "actual presence is not . . . required, and [their] participation may be satisfied through other means"); see also Div. of Youth & Fam. Servs. v. M.Y.J.P., 823 A.2d 817, 841-42 (N.J. Super. Ct. App. Div. 2003) (noting procedural requirements for parental termination cases are heightened, but "do not confer a constitutional right of confrontation or mandate a parent's presence at trial" and recognizing particular situation may call for participation by telephone or deposition). The family rules expressly allow for remote participation based on certain factors. See V.R.F.P. 17(b) (allowing court to order party to participate remotely in evidentiary proceedings, on court's own motion, "for good cause based on the factors in V.R.C.P. 43.1(h)"). These factors include whether a party is incarcerated as well as the expense of transporting the person to the courthouse. See V.R.C.P. 43.1(h)(2), (4). The court considered these factors here. The court did not err in ordering father to participate in the hearing remotely through Webex and the procedures employed by the court satisfied due process. In any event, we agree with the State that father fails to show any prejudice.

We reject father's characterization of the court's interactions with counsel and the record. The record indicates that father appeared at the hearing remotely through Webex after the court had been informed that there were no funds available to physically transport him. The court made detailed findings as to the circumstances of the failed transport order, including its attempt to discern if court funds were available to transport father after the sheriff's office indicated that it did not have sufficient funds. The court indicated that this appeared to be a statewide issue. The court took precautions to ensure father's privacy and to ensure that he knew how to signal when he wanted to consult privately with his attorney. It issued an entry order recounting the steps that it took and father's attorney's satisfaction with them. Father did not argue below that there was any instance where he could not confidentially communicate with his attorney. Father was present through Webex when mother testified at the first hearing and the record shows that father was able to meaningfully participate and privately consult with counsel if needed. See In re C.L.S., 2020 VT 1, ¶ 25 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotation omitted)).

We reject father's assertion that he received ineffective assistance of counsel because he could not sufficiently review and discuss the State's exhibits to prepare a defense while appearing via Webex. Assuming arguendo that father could bring an ineffective-assistance claim in this juvenile case, he fails to show how the alleged "incompetence prejudiced [the] case sufficiently to create the reasonable probability of a different outcome." In re M.B., 162 Vt. 229, 236 (1994). The State detailed each exhibit on the record for father's benefit, at the court's direction. The court confirmed that father heard and did not have any questions about the exhibits. The court reminded father that he would be allowed time to review the State's exhibits on the Webex platform with his attorney but father did not avail himself of this opportunity.

5

Father did not object to the admission of any exhibits. The court noted, moreover, that the exhibits were records from juvenile and criminal proceedings involving father, which father would have seen previously.

Finally, we reject father's assertion that his remote appearance at the first day of hearing violated the Equal Protection Clause and Article 7 of the Vermont Constitution. Father contends that, unlike nonincarcerated parents, he was denied access to appear in person in court. Father fails to show that he is similarly situated to a nonincarcerated person. We further note that Family Rule 17(b) applies regardless of incarceration status. Father's challenge under Article 7 fails as the court's decision bears a reasonable relation to a legitimate and compelling government purpose—establishing timely permanence for children. See 33 V.S.A. § 5101(a)(4). Even if father could show the decision was arbitrary, which he has not, he fails to show that he suffered any prejudice.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Karen R. Carroll, Associate Justice


_____
William D. Cohen, Associate Justice

6