VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     25-AP-171



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2025

In re K.L., Juvenile
(J.G., Father*)

} 
} 
} 
} 
} 
} 

APPEALED FROM:

Superior Court, Washington Unit,
Family Division
CASE NO. 22-JV-01238
Trial Judge: Kirstin K. Schoonover

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights to three-year-old daughter K.L.[*]  We affirm.

Shortly after K.L. was born in August 2022, the State filed a petition alleging that she was a child in need of care or supervision (CHINS) due to mother's use of cocaine and fentanyl while pregnant.  The petition identified father as K.L.'s presumed biological father but his address was unknown.  The State subsequently learned that father was incarcerated at Northeast Correctional Facility.  The court transferred custody to the Department for Children and Families (DCF) in an emergency care order.  Father was confirmed as K.L.'s parent in February 2023.

The court held a contested merits hearing over three days in December 2022 and February and April 2023.  The court found that K.L. was CHINS at the time the petition was filed because mother used cocaine during her pregnancy and did not seek treatment despite DCF's attempts to provide her with support, and father abused alcohol and was violent toward mother.  The court issued a disposition order in June 2023 that continued DCF custody and established a permanency goal of reunification with either parent.  The case plan adopted by the court expected father to, among other things, engage in Family Time Coaching, take a parenting education class, undergo a substance-use assessment and follow treatment recommendations, demonstrate sobriety during visits and otherwise, participate in drug screening at DCF's request, participate in a domestic-violence accountability program, and refrain from illegal activity and follow all conditions of release.

---

[*] Mother's rights to K.L. were terminated in the same order but she did not appeal.

In July 2024, DCF moved to terminate mother's and father's residual parental rights to K.L. The court held a final hearing over two days in January and April 2025. Father appeared late for the first day of hearing and did not attend the second day. The court issued a final order granting the petition in April 2025.

The court made the following findings in its order. Initially, father participated in team meetings and court hearings and worked well with his assigned DCF case worker. He was often agitated and yelled, but attempted to comply with DCF's expectations and was interested in parenting K.L. Father's case worker changed in December 2023. Father did not trust the new case worker and accused him of racism.

Early in the CHINS proceeding, father was incarcerated on charges of domestic assault for "pistol-whipping" mother, as well as possession and sale of cocaine. He was released in May 2023 and moved to his mother's home in New York City. Father indicated to DCF that K.L. could live with him there. When DCF tried to determine the suitability of father's mother's home, however, she refused to communicate with DCF.

Father completed Family Time Coaching and was approved for unsupervised visits. Starting in late 2023, and with financial assistance from DCF, father traveled to Vermont once a month for unsupervised three-day overnight visits with K.L. DCF initially paid for father's hotel stays. After four or five months of unsupervised visits, DCF became aware of social media posts indicating that father had allowed mother to contact K.L. during his unsupervised visits. DCF did not approve of this because of mother's untreated substance abuse and father's history of violence toward mother. DCF also believed that father's conditions of release prohibited him from contacting mother. Father lied to DCF about mother's involvement. DCF moved to suspend father's unsupervised visits, and the court granted the motion in April 2024.

DCF continued to support father's monthly visits with K.L. at the DCF office. DCF informed father of the steps that he would need to take to resume overnight visits, but he was not able to complete those steps. Father eventually obtained his own housing in the fall of 2024, but DCF was unable to determine its suitability.

Father completed a substance-abuse assessment, and no problems were noted. However, father did not take steps to change his abusive behavior toward others. Father started but did not complete domestic-violence programming. He became dysregulated during team meetings and was reported to have told K.L. to "shut up" during a visit. He did not take accountability for his actions toward mother. He denied being violent toward mother or making derogatory comments toward women in general.

In October 2024, DCF stopped paying for father's hotel stays because father was not attending visits with K.L. He traveled to Vermont and stayed in the hotel but did not appear for visits, making a variety of excuses. At the time of the termination hearing in April 2025, father had not seen K.L. in person since December 2024. Although father was authorized to have video calls with K.L. on Mondays and Thursdays, he called only once a week. During visits, father was frustrated with K.L. K.L. was often upset after visits. She did not talk about father at all. Father did not attend K.L.'s medical or dental appointments.

The court found that father had stagnated in his progress toward reunification, citing the suspension of unsupervised visits, DCF's inability to verify the suitability of his housing, father's

2

failure to attend visits with K.L., and his failure to take accountability for domestic violence and complete required programming. The court then assessed the factors set forth in 33 V.S.A. § 5114(a). It found that father's relationship with K.L. had faltered and she did not miss him or seek his company. In contrast, she was strongly bonded to her foster family and was well-adjusted to her daycare and friends. The court found it unlikely that father would be able to assume a parental role within a reasonable time given his inability to maintain unsupervised visits, his failure to attend visits in general, his lack of knowledge about K.L.'s medical or dental needs or daily routine, and his failure to understand her emotional and developmental needs. Finally, the court found that father did not play a constructive role in K.L.'s life. It therefore concluded that termination of his parental rights was in K.L.'s best interests.

Father's arguments on appeal concern the court's conclusion that he stagnated in his progress toward reunification. Father argues that the evidence does not support the court's findings that he failed to complete the action steps in the case plan. He argues that he complied with the steps concerning substance-use screening and sobriety and completed Family Time Coaching. He asserts that there was no evidence that he did not have suitable housing or complete a domestic-violence program or that he had engaged in criminal activity. Finally, he argues that DCF improperly suspended unsupervised visitation because father's criminal conditions allowed him to contact mother.

When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450 (quotation omitted).

The evidence supports the court's findings, which in turn support its determination that father had stagnated in his progress toward reunification. The court acknowledged that father had completed some action steps, including undergoing a substance-use screening and completing Family Time Coaching. However, "the mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re A.F., 160 Vt. 175, 181 (1993); see also In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639 (mem.) (stating "case plan is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of the children to the parent's care").

One of the three major goals identified by the case plan was for father to take responsibility for his prior aggressive and violent behavior toward mother, understand how it had affected K.L., and learn how to use nonviolent coping strategies to deal with conflict. The record showed that father made little or no progress toward this goal. The DCF case worker testified that father did not complete domestic-violence programming in Vermont, and that the person who ran the equivalent program in New York reported that father rarely attended sessions.

3

Father did not present any evidence to show that he had successfully completed a domestic-violence program. Evidence of father's dysregulation during meetings and hearings, as well as reports that he yelled at K.L. and told her to shut up, indicated to the court that father had not learned to use nonviolent coping strategies. The court credited the DCF worker's testimony that father continued to deny that domestic violence was a problem for him. See In re D.M., 2004 VT 41, ¶ 6 (explaining that "[c]hanging her own behavior and implementing the many parenting lessons she received from other service providers was and remains fully within mother's control"). Another area of concern was father's lack of engagement with K.L. After his unsupervised visits were suspended in April 2024, father became inconsistent in attending in-person visits and did not take advantage of the opportunities for video calls with K.L. By the time of the final day of hearing, father had not seen K.L. in person in five months. These factors were sufficient to support the court's finding of stagnation.

Father argues that the court improperly inferred that father had failed to complete certain action steps, and thereby essentially shifted the burden to him to affirmatively prove that he was a fit parent. Specifically, he argues DCF failed to present evidence to support its assertions that he had not completed action steps requiring him to "live a healthy sober life," maintain a household without "environmental or emotional hazards related to substances," and refrain from criminal activity. However, the court did not make findings about these steps or rely on them in its analysis. Father's argument regarding burden-shifting is therefore unsupported.

Father also argues that that DCF's failure to assess the suitability of the home he obtained in the fall of 2024 was a factor beyond his control. See In re S.R., 157 Vt. 417, 421-22 (1991) (noting that "stagnation caused by factors beyond the parents' control could not support termination of parental rights"). However, father has failed to demonstrate how DCF's alleged failure affected the outcome of the case. See In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 (explaining that in termination cases "error warrants reversal only if a substantial right of the party is affected" (quotation omitted)). It is undisputed that father's mother, with whom he lived for much of the case, refused to cooperate with DCF, and as a result DCF could not determine whether it was safe for K.L. to stay with father in his mother's home. By the time father obtained his own housing, father no longer had unsupervised visits with K.L., and therefore the suitability of his home was of minimal relevance to the stagnation analysis.

Finally, father asserts that DCF cancelled father's unsupervised visits based on an incorrect belief that his probation conditions prohibited him from contacting mother, when in fact he could have contact if mother requested it, and that this error caused his stagnation. There are several reasons that father's argument fails. First, DCF did not unilaterally cancel unsupervised visitation. The court granted DCF's motion to temporarily suspend unsupervised visits based on concerns that mother might have access to K.L. during visits. Father did not oppose DCF's motion or challenge DCF's assertions at the subsequent hearing in May 2024, and he never moved to resume unsupervised visits. Second, even if father did not violate his probation conditions by contacting mother, it is evident from the court's decision that its primary concern was that father allowed mother to have access to K.L., which DCF did not view as safe given mother's untreated substance use and father's history of domestic violence toward mother, and that father was not honest with DCF when confronted about the incident. Third, after April 2024, father stopped attending supervised visits and was inconsistent in contacting K.L. by phone. In other words, he did not avail himself of the subsequent opportunities that were offered to maintain and develop his relationship with K.L.; in the trial court's words, he "simply gave up." For these reasons, we are unpersuaded that the suspension of unsupervised visits was

4

caused by factors beyond father's control or that DCF's alleged misunderstanding of his probation conditions stymied his efforts toward reunification.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice