VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.        25-AP-314



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JANUARY TERM,   2026

| | |
|---|---|
| In re H.B., Juvenile<br>(A.B., Mother\*) | APPEALED FROM:<br><br>Superior Court, Windsor Unit,<br>Family Division<br>CASE NO. 22-JV-01324<br>Trial Judge: Howard A. Kalfus |

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights in son H.B., born in August 2021.[*] We affirm.

In September 2022, the State filed a petition seeking a determination that H.B. was a child in need of care or supervision (CHINS). The supporting affidavits alleged that one-year-old H.B. was at imminent risk of harm because mother was unable to ensure his safety or meet his basic needs. The family division placed H.B. in the custody of the Department for Children and Families (DCF) under emergency- and temporary-care orders.

A contested merits hearing was held over three days between January and May 2023. The court made the following findings in an August 2023 order. From the time of H.B.'s birth until he was placed in DCF custody, mother was unable to provide primary care for him. She sought assistance from friends, family, and others who stayed at or frequented her home. At various times, mother left H.B. in the care of others for extended periods without making appropriate legal arrangements. Many people who were struggling with substance-use disorder came by mother's home, and at times they were under the influence while H.B. was present. This created an unsafe environment for H.B. Around mid-May or June 2022, mother began exhibiting erratic behavior. She would be "fine one minute" and then "yelling and screaming over nothing." On this basis, the court concluded that H.B. was CHINS at the time of the State's petition.

---

[*] Father voluntarily relinquished his parental rights in H.B. and did not appeal the court's termination order. We therefore focus here on the factual and procedural background relevant to mother.

A contested disposition hearing was held over three days between March and July 2024. In August 2024, the court adopted a case plan with a goal of reunification by October 2024. Mother's action steps included: participating in mental-health, psychiatric, and substance-abuse assessments and following any resulting treatment recommendations; securing safe and stable housing and maintaining a source of income; and demonstrating an ability to supervise and monitor H.B. appropriately and put his needs before her own.

Mother appealed the court's merits determination and disposition order, and this Court affirmed. In re H.B., No. 24-AP-267, 2025 WL 475803 (Vt. Feb. 7, 2025) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents/eo24-267_0.pdf.

In February 2025, DCF filed a petition to terminate parents' rights in H.B. Father voluntarily relinquished his rights, and the court issued an order terminating father's rights in H.B. in July 2025. The court held a contested hearing on the petition to terminate mother's rights over two days in August 2025. At the conclusion of the hearing, it made the following factual findings on the record.

H.B. had been in DCF custody since September 2022, when he was just over a year old. During this time, DCF made numerous referrals for services to help mother address the issues identified in the disposition case plan. The agency offered to help mother with her mental-health issues and possible substance-abuse issues, and, most importantly, it sought to assist mother in overcoming her inability to recognize and appropriately respond to H.B.'s developmental needs and his need for safe, appropriate parenting.

Mother's overall mental health remained poor. She has Attention-Deficit/Hyperactivity disorder (ADHD), which profoundly impacts her daily life when she is unmedicated. She becomes overwhelmed and struggles to attend appointments on time, including medical appointments for H.B. or supervised visits. Mother also struggled with anger. She made increasingly threatening statements about DCF and the individuals involved with her case, including references to inflicting serious physical harm and taking people's lives. Although mother recognized her anger issues and at times reached out to supports, her mental health remained as much of a problem as it had been at the beginning of the case. At the time of the final hearing, mother was not taking ADHD medication or receiving psychiatric care. She expressed a desire to do so but struggled to secure these services.

Initially, mother had four supervised visits with H.B. each week. At some point, the visits were increased and then decreased again. Due to safety concerns, visits were suspended entirely for about a month during the spring of 2025, following which the court issued a juvenile protective order reducing mother's visits to twice weekly. While this order significantly limited mother's ability to progress toward more frequent and unsupervised visits, it was necessary as a result of mother's own conduct.

Mother was inconsistent in attending visits throughout the case. She never progressed to unsupervised or overnight visits. During supervised visits, mother at times demonstrated an inability to ensure H.B.'s safety, follow his cues, and interact with him appropriately. She was late to or unprepared for some visits, and at times she left visits early, expecting the visit supervisors to watch H.B. H.B. was often upset after visits with mother.

Mother and H.B. both had love and affection for one another, and their interactions were, at times, positive. Mother very much wanted to reunify with H.B. But while mother made some progress in her case plan, her efforts with respect to the action steps fell short. She was still

unable to reasonably ensure H.B.'s basic safety and had made little progress toward being able to parent him in a way that ensured his positive development and wellbeing.

H.B. had been in his foster placement since September 2022 and had a loving relationship with his foster parents and foster siblings. By the time of the termination hearing, H.B. had lived in their home far longer than he lived anywhere else. His foster parents provided a stable living environment for him and ensured that all his needs were met. They planned to adopt H.B. if he were freed for adoption.

Based on these findings, the court held that there had been a change of circumstances resulting from mother's stagnation in her progress toward the case-plan goal. It then weighed the statutory factors and concluded that termination of mother's rights was in H.B.'s best interests. It explained that while H.B. and mother had a bond, mother had been inconsistent in her contact with H.B. and their visits were at times upsetting for him, despite mother's good intentions. At the same time, H.B. had a very loving relationship with the members of his foster family. He was well-adjusted to his environment, which provided him with stability. Mother was not likely to be able to resume parenting H.B. within a reasonable period as measured from H.B.'s perspective. The case had been pending for three years, and H.B. recently turned four and had an immediate need for permanency. Mother did not play an overly constructive role in H.B.'s life. The court therefore granted the State's petition to terminate mother's rights. This appeal followed.

Where termination of parental rights is sought after an initial disposition order, the family division must first find changed circumstances. 33 V.S.A. § 5113(b). If this threshold is met, the court goes on to consider whether termination of parental rights is in the child's best interests by weighing the four statutory criteria at 33 V.S.A. § 5114(a). In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.). The State bears the burden of proof at both stages of this analysis "and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108 (quotation omitted). Provided the court applied the proper standard, we will not disturb its findings unless clearly erroneous and will affirm its conclusions if supported by the findings. In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, mother does not challenge the court's conclusion that there had been a change in circumstances arising from her stagnation. She argues, however, that the court erred in concluding that the statutory best-interests factors favored termination because it found that she had a continuing bond with H.B. and was engaged in ongoing work toward the case-plan goal. Mother also notes that she testified that she was committed to maintaining H.B.'s stability with his foster parents and contends that it would have been in H.B.'s best interests to continue DCF custody so that mother could complete the case plan.

Mother's arguments are primarily directed at the court's assessment of the third—and most important—of the best-interest factors: "the likelihood that the parent will be able to resume or assume parental duties within a reasonable period of time." 33 V.S.A. § 5114(a)(3); In re J.B., 167 Vt. 637, 639 (1998) (mem.). "The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (citation omitted).

Mother contends that the evidence did not support the court's conclusion that she would be unable to resume her parental duties within a reasonable period of time because she made significant—though admittedly imperfect—progress toward the case-plan goal. We have explained, however, that "while parental improvement is a factor to consider, the real test is

whether there is a reasonable possibility of reuniting parent and child within a reasonable period of time." In re J.J., 143 Vt. 1, 6 (1983). Here, the court properly focused on mother's ability to resume her parental duties within an amount of time that was reasonable from H.B.'s perspective, given his young age and immediate need for permanency. See, e.g., In re C.L., 2021 VT 66, ¶ 19, 215 Vt. 341 (holding mother's failure to sufficiently improve ability to care for child during pendency of proceeding supported conclusion that she was unable to resume parenting within reasonable time given child's need for stability and permanency). Moreover, while the court recognized that mother and H.B. loved one another, the statute does not require that the parent-child bond be maintained where severance of the bond is in the child's best interest. In re M.B., 162 Vt. 229, 237-38 (1994) (explaining that father's professed love for children and desire to care for them did not outweigh evidence that he would be unable to provide appropriate environment within reasonable period and concluding that record supported termination of father's rights under statutory best-interests factors). The court considered each of the statutory criteria and found that the interest in maintaining the bond between H.B. and mother was outweighed by H.B.'s need for immediate permanency that mother could not provide.

The court's findings supported its determination that termination of mother's rights was in H.B.'s best interests. Although mother contends that the court should have reached a different decision, "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.). Mother has not demonstrated any abuse of discretion here.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Nancy J. Waples, Associate Justice

4