VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      25-AP-381



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MARCH TERM,   2026

| | |
|---|---|
| In re X.D. and D.D., Juveniles (T.L., Father\*) | APPEALED FROM:<br><br>Superior Court, Caledonia Unit,<br>Family Division<br>CASE NO. 22-JV-00354; 22-JV-00355<br>Trial Judge: Bonnie J. Badgewick |

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights in daughter D.D., born in April 2019, and son X.D., born in October 2020.  We affirm.

## I.  Background[1]

The record reflects the following.  In March 2022, the State filed petitions seeking determinations that D.D. and X.D. were children in need of care or supervision (CHINS).  The supporting affidavit of a Department for Children and Families (DCF) worker included the following allegations.  At the time the petitions were filed, father had pending charges including one count of felony lewd and lascivious conduct with a child, one count of felony sexual recording, and eleven counts of felony possession of child sexual abuse material (CSAM).  Mother and father were married and living with the children in the home of father's sister, and father's sister was responsible for reporting any violation of father's conditions of release to law enforcement. Father's conditions required that mother supervise all contact between father and the children.  Mother and father's sister, however, told the DCF worker that they did not believe the charges against father were legitimate. Given these statements, DCF was concerned that father had unfettered access to the children in the home, placing them at risk of harm.

---

[1]  As discussed below, mother voluntarily relinquished her parental rights in D.D. and X.D. contingent on the termination of father's rights.  Her separate appeal from the family division's denial of her later motion to withdraw her relinquishment is currently pending before the Court in case number 25-AP-437.  See Doe v. Camacho, 2024 VT 72, ¶ 2 n.1, 220 Vt. 226 (recognizing that this Court "may take judicial notice of the docket entries in a separate, related case").  We therefore focus here on the factual and procedural background relevant to the arguments raised by father in the instant appeal.

The family division transferred custody of the children to DCF under emergency- and temporary-care orders. In March 2023, the court entered CHINS merits findings based on the parties' stipulation. The parties agreed that, at the time the CHINS petitions were filed: (1) father had multiple pending charges for sex offenses with underage victims and, as such, was subject to conditions of release that prevented him from having contact with the children outside mother's presence; (2) DCF was unable to ascertain whether mother took the charges and her supervision responsibilities seriously; and (3) this lack of assurance, in conjunction with the potential risk to the children arising from the severity of the allegations against father, placed the children at risk of harm.

In October 2023, the court issued a disposition order adopting a case plan with a goal of reunification between mother and the children by January 2024. By the time the case plan was created, father had resolved his pending criminal charges pursuant to a plea agreement, by which he pleaded guilty to both lewd and lascivious conduct with a child and possession of CSAM, and was awaiting sentencing. His action steps in the case plan included: communicating with the children to the extent deemed "safe and appropriate"; following all conditions in his criminal cases, including complying with his sex-offender conditions as determined by the Department of Corrections; and participating in a parenting class. Neither parent appealed the merits or disposition orders.

In February 2024, father was sentenced to serve three-to-four years in a correctional facility. The reunification goal date was later extended to September 2024. In September 2024, the State filed petitions to terminate both parents' rights in the children.

The first day of the termination hearing was in February 2025. At the outset of the hearing, mother voluntarily relinquished her parental rights in the children contingent on the termination of father's rights (that is, if father's rights were not terminated, mother's relinquishment would be void). The court then began taking evidence on the petition to terminate father's rights. The evidence as to father was closed following a second hearing day in May 2025.

The court had yet to issue a decision in July 2025, when the children's attorney moved to reopen the evidence on grounds that the children had been moved to a new placement after DCF opened an investigation into their foster home. The court granted the motion. It explained that its intention was "not necessarily to reopen evidence for purposes of what we've already taken," but instead to take evidence on the change in the children's circumstances following their removal from their prior foster home. Mother then moved to withdraw her relinquishment based on the change in the children's foster placement.

In August 2025, the court took additional evidence from the DCF worker. The DCF worker testified that the change in the children's placement did not alter her opinion that father's parental rights should be terminated. She explained that father remained incarcerated and still posed a risk of sexual abuse to the children; given these circumstances, it was her view that he would be unable to reunify with the children within a time frame that would meet their need for permanency. At the conclusion of the hearing, mother's attorney stated that if her motion to withdraw her relinquishment were granted, mother would present evidence in opposition to the State's petition to terminate her parental rights.

In October 2025, the family division issued an order denying mother's motion to withdraw her relinquishment. On the same date, it issued an order terminating both parents' rights. The order included the following factual findings.

On the day of D.D.'s birth in April 2019, father was arrested on a charge of lewd and lascivious conduct with a five-year-old girl. In 2021, father was charged with nine counts of possession of CSAM and one count of felony sexual video recording. Before the children entered DCF custody, mother was their primary caregiver.

Father's charges were still pending in March 2022, when D.D. and X.D. were placed in DCF custody due to concerns of risk of sexual abuse and mother's inability to demonstrate protective capacities for the children. At the time, mother clearly expressed to DCF that she did not believe the charges against father were legitimate or that he posed a risk to the children.

After the children were placed in DCF custody and before father's incarceration, DCF offered father an opportunity to participate in Family Time Coaching; father refused. Father pleaded guilty to felony charges of lewd and lascivious conduct with a child and possession of CSAM in June 2023. In February 2024, he was sentenced to serve a minimum of three years and a maximum of four years in a correctional facility.

Although father asserted that he had taken accountability for the conduct leading to his incarceration through his guilty plea and subsequent sentencing, the court found that father had not consistently taken accountability for his actions. This prevented DCF from assessing whether the risk to the children had been mitigated.

A DCF worker attempted to arrange for father to have contact with the children through the correctional facility. However, father's facility caseworker indicated that father could not have consistent meetings or contact with D.D. and X.D. because father's enrollment in sex-offender treatment included a condition precluding contact with minors.

Over a year after he was incarcerated, father sent letters to the children. After discussing the letters with the children's providers and therapists, DCF determined that the letters should not be delivered to the children until they were older. A therapist indicated that receiving the letters would be confusing for the children given how long it had been since they had contact with father.

Father engaged in two parenting classes while incarcerated. However, his incarceration otherwise limited his ability to participate in case services.

Shortly before the start of the May 2025 hearing, father's probation officer learned that father was going to be terminated from the sex-offender treatment program in the facility.[2] Father had previously been placed on a corrective-action plan for several reasons. There were concerns about his ability to satisfactorily take responsibility for his offenses and he had spoken about D.D. and X.D. in the treatment program's classes, which was deemed inappropriate. Father's termination from sex-offender treatment was likely to constitute a violation of his probation conditions and could delay his release date.

D.D. and X.D. had multiple foster placements during their time in DCF custody. X.D. has been diagnosed with autism and has difficulties with transitions, encountering new people, and regulating his emotions. He requires nonverbal communication and, when dysregulated, will scream, hit, and bite. He has an individualized education plan through his school and works with

_____

[2] Father's probation officer explained at the May 2025 hearing that father was subject to conditions of probation while incarcerated, and those conditions included successful completion of a sex-offender treatment program.

occupational and speech-and-language therapists. He needs daily medications for asthma and allergies and takes risperidone for dysregulation. D.D. struggles with anxiety and requires asthma medications as needed. Both children receive counseling and have a therapeutic case manager. They have spent the majority of their lives in DCF custody and have needs beyond those of other children due to the disruption they have experienced.

At the time of the termination hearing, mother and father were in the process of divorcing. Because of father's failure to consistently take accountability for the actions underlying his convictions, DCF was unable to assess the risks of possible re-offense or the danger posed to the children. Even if father were released at the earliest possible date, in December 2025, he would need to accomplish numerous action steps prior to reunification, including securing housing, employment, and transportation, and participating in Family Time Coaching to gain parenting skills. Any contact between father and the children would need to be part of a slow reintroduction process including supervised visitation. The reintroduction process could take more than a year. X.D.'s special needs could add additional time to the process as DCF would need to refer father and X.D. for specific services.

The family division concluded that there had been a change in circumstances due to father's stagnation in his ability to care for the children. He remained incarcerated, had recently been terminated from sex-offender treatment, and upon release would need significant time to be reintroduced to the children's lives and marshal the resources necessary to provide for them. He was largely, if not entirely, unprepared to parent the children. It was also unlikely that father could meet X.D.'s complex needs. The court further noted that father's charges involved a pattern of sexually victimizing children close in age to D.D. and X.D., and that his inability to take accountability for those actions—even after pleading guilty—suggested that father was unwilling or unable to mitigate any risk he might pose to his children.

The court then concluded that it was in the children's best interests that father's parental rights be terminated. He had little, if any, relationship with either child and had been incarcerated for much of their lives. He had never played a constructive role in the children's welfare. It remained unclear when father would be released, and upon release he would need significant time to prepare for reunification with the children. He would not be able to resume parenting within a reasonable time from the children's perspective. Both children had an urgent need for permanency and stability that father was unable to provide.

For these reasons, the court issued an order terminating father's residual parental rights in D.D. and X.D. This appeal followed.

## II. Discussion

When considering a petition to terminate parental rights after initial disposition, the family division engages in a two-step analysis. In re B.M., 165 Vt. 331, 335 (1996). It must first consider whether a change in circumstances requires modification of the disposition order to serve the best interests of the children. 33 V.S.A. § 5113(b). Where this threshold is met, the court goes on to determine whether termination of parental rights is in the child's best interests by weighing the four factors set forth at 33 V.S.A. § 5114(a). In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.).

The State bears the burden of proof at both stages of this analysis "and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108 (quotation omitted). "The decision to terminate parental rights," however, "is committed to

4

the discretion of the family court." In re D.M., 162 Vt. 33, 38 (1994). Thus, we will uphold the family division's findings unless clearly erroneous and will affirm its conclusions if supported by the findings. In re J.B., 167 Vt. 637, 639 (1998) (mem.). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [a parent's] parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.).

Father raises a multifaceted argument on appeal. He first contends that, under the circumstances of this case, his legal rights are intertwined with mother's such that he has standing to raise arguments on her behalf. He then asserts that the termination order must be reversed because: (1) the evidence did not support the conclusion that either parent stagnated in their progress toward the case-plan goal of reunification between mother and the children; (2) the court failed to specify that it applied the clear-and-convincing-evidence standard in its best-interests analysis, and the evidence did not support a finding that termination of either parent's rights was in the children's best interests under that standard of proof; and (3) both parents were deprived of due process in the termination of their rights.

We need not reach the standing question because, assuming father had standing to raise these arguments on mother's behalf, no party preserved them for our review on appeal by presenting them to the trial court. See In re C.H., 170 Vt. 603, 604 (2000) (mem.) (declining to address argument on appeal from order terminating parental rights where father "fail[ed] to raise it at any point during the family court proceedings"). First, the arguments father seeks to raise for mother are entirely at odds with the manner in which mother chose to proceed below. The family division did not take evidence relevant to the petition to terminate mother's rights because mother voluntarily relinquished her rights at the outset of the termination hearing. Although mother later moved to withdraw her relinquishment, her attorney indicated that mother would present evidence in opposition to the petition to terminate her parental rights only if that motion were granted. The court denied the motion and then terminated mother's rights based on her relinquishment. As a result, the court did not consider whether there had been a change in circumstances sufficient to warrant revisiting the disposition order with respect to mother or whether the termination of her parental rights was in the children's best interests. Second, to the extent father argues that the court should have weighed the possibility of reunification with mother in determining whether to terminate his parental rights, he failed to raise this argument below despite having ample opportunity to do so following mother's motion to withdraw her relinquishment.

We also reject father's argument that In re A.W., 2020 VT 34, 212 Vt. 225, rendered the termination of his (or mother's) parental rights improper. In that case, no party moved to modify the existing disposition order—which called for reunification with one or both parents—prior to a hearing at which both parents voluntarily relinquished their parental rights. The children appealed from the court's subsequent termination order, arguing that the court erred in modifying the disposition order where the children did not stipulate to the modification and there was no pending motion to modify. We agreed and reversed, explaining that because the statute provides that a disposition order may be modified only "based on the stipulation of the parties or pursuant to a motion to modify," 33 V.S.A. § 5318(d), in the "relatively unusual situation . . . where children object to their parents' voluntary agreements to terminate parental rights, the court may terminate parental rights only after notice and a hearing to determine whether such action is in [the] children's best interests." In re A.W., 2020 VT 34, ¶ 12.

5

Here, the State moved to modify the initial disposition order in connection with its termination petitions. Father objected to termination, and the court therefore held a hearing and considered whether the State demonstrated changed circumstances sufficient to modify the disposition order. The statutory provision that drove our conclusion in In re A.W. is not at issue here. 2020 VT 34, ¶¶ 10-12 (reversing because "the procedure followed by the court in this case was not authorized under the statute"). Furthermore, the children and DCF supported mother's voluntary relinquishment decision. As a result, In re A.W. does not support father's contention that he may raise arguments for mother on appeal.

With this understanding of the scope of our review, we consider father's other arguments to the extent he raises them on his own behalf. We turn first to his contention that the order terminating his parental rights must be reversed because the trial court failed to afford him due process. He argues that issuance of the merits and disposition orders was delayed for reasons not attributable to parents, the court improperly required the parents to show changed circumstances at disposition, and that parents were not provided with timely notice that obtaining a divorce was, allegedly, an "unspoken" requirement of the case plan.

Father's first two due-process arguments represent a collateral attack on the merits and disposition orders. The merits and disposition orders are final orders from which no party timely appealed. See 33 V.S.A. § 5318(d) ("A disposition order is a final order."); In re M.M., 2024 VT 28, ¶ 5 n.1, 219 Vt. 252 (explaining that merits adjudication may be appealed following issuance of disposition order). As a result, father can raise these arguments only if he satisfies the Vermont Rule of Civil Procedure 60(b)(4) criteria for obtaining relief from a final judgment under by demonstrating that the judgments are "void." In re K.G., 2023 VT 51, ¶ 42, 218 Vt. 419. Father may not collaterally attack the disposition orders on grounds that they are erroneous; rather, those judgments are void only if the court below "lacked jurisdiction of the subject matter, or of the parties, or . . . acted in a manner inconsistent with due process of law." In re C.L.S., 2020 VT 1, ¶ 17, 211 Vt. 344 (quotation omitted). Father does not attempt to argue that the orders are void, and his due-process arguments do not otherwise satisfy the applicable standard.

With respect to father's argument that the court improperly required a showing of changed circumstances at disposition, father has not demonstrated any error, let alone a deprivation of due process. At disposition, the family division is authorized to issue a conditional custody order (CCO) returning legal custody of the child to the custodial parent subject to conditions set by the court. 33 V.S.A. § 5318(a)(1). Here, the court declined to grant mother's request that the children be returned to her care under a CCO and instead continued DCF custody. Father argues that, in doing so, the court erroneously shifted the burden to parents to show changed circumstances. In support, however, he cites only to the family division's statement, during the disposition hearing, that absent "a change in circumstances" with respect to suitable housing, access to financial resources, and other factors, it would be "reluctant to issue conditional custody." This passing reference to changed circumstances does not sustain father's contention that the court erroneously applied the 33 V.S.A. § 5113(b) modification standard at initial disposition. When considered in context of the court's surrounding statements, it is clear that this language instead reflected the court's conclusion that it would be "contrary to [the children's] best interests" to return them to mother's care where there remained "substantial steps that mother need[ed] to take in order to create or provide certainty of a safe and supportive environment for the children."

Nor has father demonstrated that the delays in issuing the merits and disposition orders rendered them void. With respect to this argument, father points to our decision in In re H.T., 2020 VT 3, ¶ 24, 211 Vt. 476. In that case, the parents appealed the trial court's decision to terminate parental rights at initial disposition, contending that a two-and-a-half-year delay between the merits and disposition orders resulted in the deprivation of their parental rights without due process. Id. ¶¶ 1, 24-25. We agreed that the delay amounted to error because, during the gap between merits and disposition, parents "did not have the benefit of a court-reviewed disposition plan." Id. ¶ 26. We declined to reverse, however, concluding that the error was harmless because there was no "reasonable probability that the court would have returned conditional custody to parents had it issued a disposition order" where "the deficits that led to removal of the children, and ultimately termination, persisted with little change throughout the duration of the case." Id. ¶ 27.

We first note that In re H.T. is distinguishable because it involved a direct appeal, not a collateral challenge. The question posed in that case was whether the delay amounted to error, not whether parents demonstrated the "much narrower" grounds for overturning a final judgment outside of a direct appeal. In re C.L.S., 2020 VT 1, ¶¶ 21-22 (distinguishing cases cited by parents in support of contention that CHINS adjudication was void on grounds that each involved a direct appeal). This case is also fundamentally different from In re H.T. because the court did not terminate father's rights at disposition but instead adopted a case plan. Like the parents in In re H.T., however, father has failed to demonstrate prejudice. See In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 (explaining that error warrants reversal in termination case only if "a substantial right of the party is affected" (quotation omitted)). His arguments in this regard focus only on the termination of mother's rights; for the reasons discussed above, we do not consider those contentions here. As a result, father has not demonstrated prejudice or established that the merits or disposition orders are void.

Father also argues that he did not receive appropriate notice prior to the termination of his parental rights because the case plan did not require that parents obtain a divorce and father never suggested that he wanted to parent on his own, but the court cited the divorce and father's inability to parent on his own as a basis for its finding of stagnation.

To be sure, father had a due-process right to notice of the fact that the State was seeking termination of his parental rights and the grounds on which termination was sought. In re H.A., 153 Vt. 504, 509-10 (1990). A notice violation will result in reversal, however, only where the party claiming a violation demonstrates prejudice. Id. at 510. Here, father received notice of the fact that the State sought to terminate his parental rights and the ground on which termination was sought. Even assuming that father is correct that obtaining a divorce was an "unspoken" case-plan requirement, he cannot show prejudice. The court considered father's ability to parent on his own not because the parties were divorcing, but because mother had relinquished her rights. As a result, there is no connection between the claimed due-process failure and the termination of father's rights.

Next, father contends that the evidence did not support the family division's conclusion that there was a change in circumstances arising from stagnation in his progress toward the case-plan goal. He points out that the goal was reunification between mother and the children, and his action steps were intended only to support that goal—not to prepare him to parent the children on his own. Therefore, he argues, the court's findings about whether father was prepared to parent the children on his own were irrelevant to the analysis.

7

It is true that the change of circumstances most commonly found in termination case is parental stagnation, which occurs "if the parent has not made the progress expected in the plan of services for the family despite the passage of time." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.). But "the statutory standard is changed circumstances, not stagnation, and stagnation is not the only way to show changed circumstances." In re D.C., 2012 VT 108, ¶ 18, 193 Vt. 101. Although the trial court could have framed its conclusion differently, it did not err in concluding that there had been a change in circumstances. Mother—the only parent who was the subject of reunification efforts—relinquished her rights in the children. See, e.g., id. ¶¶ 16-17 (concluding that any error in failing to find changed circumstances was harmless because changed circumstances were "manifest" where disposition plan called for reunification only with father, father relinquished his rights, and grandmother died after assuming custody of child). This, alone, sufficed to establish changed circumstances warranting the court's modification of the initial disposition order because it precluded the order's goal of reunification with mother.

Finally, father argues that the termination order must be reversed because the trial court did not specify that it applied the clear-and-convincing evidence standard in its best-interests analysis. As father points out, the trial court specified that it applied this standard to its changed-circumstances analysis, but was silent as to the standard under which it conducted its best-interests analysis. It then went on to indicate that it made its determinations as to reasonable efforts and the applicability of the Indian Child Welfare Act under the lower preponderance-of-the-evidence standard. See 33 V.S.A. § 5231(c) (providing with respect to juvenile proceedings that standard of proof on termination of parental rights is "clear and convincing evidence" while "[o]n all other issues, the standard of proof shall be a preponderance of the evidence").

At the outset, we note that this is not a case where the court expressly applied an incorrect standard of proof. See, e.g., In re R.W., 2011 VT 124, ¶¶ 16-18 (reversing termination order where court explicitly applied preponderance standard to changed-circumstance analysis). Rather, there is evidence in the record that the court applied the correct standard: on the first day of the termination hearing, the court advised mother in her relinquishment colloquy that the State had the burden of proof on its termination petition by clear and convincing evidence, explaining that this was a "high standard of proof" and mother had "the right to have that high proof standard at this hearing." This suggests that the court applied the correct standard of proof, but simply neglected to include the standard in its written order.

In any event, while it is "our decided preference that trial courts enunciate the standard of proof with specificity," we will not overturn a court's termination order based on "omission of the actual phrase 'clear and convincing' " where examination of the findings indicate that the correct legal standard was applied. In re C.L., 151 Vt. 480, 488-89 (1989) (concluding despite lack of express statement that trial court applied correct standard where it stated "it was 'convinced' " that mother would be unable to resume parenting within a reasonable time); In re D.P., 147 Vt. 26, 32 (1986) (concluding same where trial court stated it " 'was convinced beyond any reasonable doubt' " that father was unfit parent and that evidence " 'overwhelmingly' " indicated that father was incapable of parenting either child); In re C.W., 148 Vt. 282, 284 (1987) (concluding same where court found " ' this was a "clear case" for termination of parental rights' " and that there was " '<u>no</u> likelihood' " that mother would be able to resume parenting within reasonable period).

Here, the language used by the trial court supports the conclusion that it applied the clear-and-convincing-evidence standard in weighing the § 5114(a) factors. It found that: the children had "no" ongoing relationship with father, who was "a relative stranger" to them; it was

"unlikely, if not impossible," that father would be able to provide the children the same level of stability they experienced in their final foster placement; that given the length of time the children had been in custody, they had "an urgent need for the permanency and stability that father is unable to provide"; and that father's failure to engage successfully with sex-offender treatment programming demonstrated his "unwillingness to mitigate the risk he may pose to his children" and, because it would likely extend his release date, was "a self-created physical barrier" that continued to prevent him from developing a relationship with the children. The court concluded that all of the factors weighed in favor of termination of father's parental rights, and expressly stated that the first, third, and fourth factors weighed "heavily" against father retaining parental rights.

The "most important" of the statutory best-interest factors is the third, which calls for the court to consider the likelihood that the parent will be able to resume or assume parental duties within a reasonable period. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325; see 33 V.S.A. § 5114(a)(3). "The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (citation omitted). While past events are relevant to this analysis, the court's inquiry must be "forward-looking" and directed at the "parent's prospective ability to parent the child." In re D.S., 2014 VT 38, ¶ 22 (quotations omitted). Here, the court's finding that termination of father's parental rights was in the children's best interests was plainly driven by its conclusion that the children had an immediate need for permanency that father simply could not provide. The unequivocal language the court used to express its underlying findings demonstrates that it applied the correct standard of proof. See, e.g., In re C.W., 148 Vt. at 284 (concluding that court applied correct standard notwithstanding failure to specify where it found, among other things, " 'no likelihood' " that mother would be able to resume parenting within reasonable period). We decline to elevate "form over substance" by reversing the court's order based on its omission of the standard of proof. In re C.L., 151 Vt. at 489.

Father has not identified grounds to disturb the family division's order terminating his parental rights.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Christina E. Nolan, Associate Justice

_____
Michael P. Drescher, Associate Justice